_____

Nos. 95-1857/1956
_____

Ralph L. Gray,                          *
                                        *
        Appellant/Cross-Appellee,       *
                                        *  Appeal from the United States
        v.                              *  District Court for the
                                        *  Western District of Missouri.
O. Gene Bicknell,                       *
                                        *
        Appellee/Cross-Appellant.       *

_____

Submitted:  December 11, 1995

Filed:  June 25, 1996
_____

Before MAGILL, GOODWIN,* and MURPHY, Circuit Judges.

_____

MAGILL, Circuit Judge.

        Ralph Gray and Gene Bicknell entered into a series of contracts in
connection with the formation of a restaurant joint venture.  After the
joint venture failed, Gray commenced this diversity action against Bicknell
for payment on two promissory notes, breach of contract, and breach of
fiduciary duty.  Bicknell counterclaimed for breach of contract and
contribution on joint obligations.

        Gray now appeals from a jury verdict, arguing, in part, that Bicknell
failed to provide adequate notice of breach as required by their contract
and that Bicknell waived his attorney-client

_____

        *THE HONORABLE ALFRED T. GOODWIN, United States Circuit
        Judge for the Ninth Circuit, sitting by designation.

privilege by inadvertently disclosing two letters written to him by his attorney.  Bicknell cross-appeals, asserting that Gray lacks standing to bring a breach of fiduciary duty claim.  We affirm in part and reverse in part.

## I.

In 1983, Ralph Gray, a real estate broker, entered the restaurant business when a client withdrew from a deal to purchase a restaurant site, leaving Gray with the property.  Gray converted the property into a Mexican restaurant called Raphael's Mexican Restaurant.

Over the next five years the business expanded, and by early 1988 Gray owned and operated three Raphael's Mexican Restaurants through a holding company called RMR #1, Inc. (RMR).  Gray also owned Raphael's Management, Inc. (RMI), which provided general management services to the restaurants in exchange for five percent of RMR's gross sales.  Both RMR and RMI were organized under Missouri law.

On March 8, 1988, Bicknell purchased fifty percent of RMR from Gray.  Gray initially approached Bicknell about buying a stake in RMR in 1986.  Bicknell's involvement in the enterprise would, Gray believed, have three primary benefits: (1) Bicknell had significant experience in restaurant management, (2) Bicknell possessed the financial resources to expand the business, and (3) Bicknell's involvement would reduce the work load for Gray, freeing him to pursue other interests.  Bicknell presumably believed that RMR offered the prospect of future growth and favorable return on investment.

The central component of the agreement between Gray and Bicknell was a stock purchase agreement (SPA).  Bicknell purchased 500 shares of RMR stock from Gray in exchange for $500,000 in cash

and a $261,380 promissory note payable in two annual installments. Under the terms of the SPA, RMR was required to cancel its management contracts with RMI. Gray and Bicknell also entered into two ancillary agreements on March 8. First, a real estate agreement (REA) transferred half ownership of the Battlefield restaurant property to Bicknell in exchange for a $114,312 promissory note.[1] Second, a stock transfer restriction agreement established the terms by which RMR stock could be transferred upon the death of a party or a disagreement or breach between the parties. In case of a breach of the SPA by one of the parties, the restriction agreement limited the nonbreaching party's remedy to requiring the other to repurchase the stock of the nonbreaching party.

Gray and Bicknell divided responsibility for controlling and managing RMR. Both parties acted as directors of the company. Gray remained the president of RMR, while Bicknell became chairman of the board of directors. Day-to-day operations of the restaurants were the responsibility of the on-site managers. To handle the bookkeeping and management functions previously done by RMI, Gray and Bicknell agreed to form a new company.

Not long after the parties concluded the March agreements, the business began to flounder. A new restaurant failed to perform up to RMR's expectations, placing a financial and operational strain on RMR. More significantly, the relationship between Gray and Bicknell began to sour over the payment of management fees and the division of management responsibilities.

For a variety of reasons, the responsibilities of RMI never fully shifted to its newly-formed replacement. Consequently, RMI

---

[1]RMR opened its third restaurant site on Battlefield Road in Springfield, Missouri. This real estate is referred to as the Battlefield restaurant property.

continued to take five percent of RMR's revenues as a management fee despite the SPA's provision that this practice would cease once Bicknell became a fifty percent owner. In May 1988, after Bicknell realized that RMR was still paying RMI a management fee, he voiced his objection to Gray during a directors' meeting, and he asked that Gray repay RMR the full amount of management fees received by RMI since March 8, 1988 and discontinue paying RMI these fees in the future. Bicknell also asked Gray to buy back his 500 RMR shares. On June 23, 1988, Bicknell's attorney wrote Gray to reiterate Bicknell's requests. Gray did neither and Bicknell apparently did not pursue the issue further.

From August 1988 to March 1989, Gray and Bicknell did not communicate. In the first part of 1989, Gray called several board meetings with the stated purpose of reducing the distrust that had grown between him and Bicknell and addressing RMR's financial problems. According to Bicknell, he did not attend because he believed that Gray's intention was to pressure him into increasing his investment in RMR and forgiving Gray's breach of the SPA. He did, however, offer to sign consents and other resolutions necessary for the board to continue its business. In June 1989, Gray and Bicknell finally met to discuss RMR. Bicknell offered to purchase Gray's share of RMR, but, after protracted negotiations, the parties could not reach agreement. Three months later, on September 14, 1989, Bicknell, and then Gray, resigned as directors of RMR.

The damage to RMR from the management impasse was exacerbated by RMR's continuing cash flow problems. By late 1989, RMR was delinquent on its lease and mortgage obligations on the restaurant buildings. RMR's accounts payable were $300,000 in arrears and vendors required RMR to purchase food and supplies C.O.D. The business continued to deteriorate until May 10, 1990, when creditors placed RMR into involuntary bankruptcy.

The bankruptcy court appointed a trustee to run RMR. In the trustee's judgment, RMR did not have enough cash at the time of filing to meet its ongoing operational needs. The trustee therefore went about selling the company's assets. Eventually, the trustee sold RMR's assets to Bicknell for $575,000. A separate corporation owned by Bicknell purchased RMR's real estate.

On June 18, 1990, Gray sued Bicknell in federal court based on diversity jurisdiction, asserting four claims. Three of Gray's claims were for breach of contract, alleging respectively that Bicknell failed to pay the $261,380 promissory note given as consideration for the stock purchase, failed to pay the promissory note given as consideration in the REA, and failed to pay one-half of the debt secured by the real estate. Gray also claimed that Bicknell breached a fiduciary duty owed to him by failing to adequately direct RMR and by forcing RMR into bankruptcy for Bicknell's own benefit.

In response, Bicknell asserted three counterclaims. In Count I, Bicknell argued that Gray had materially breached the SPA by continuing to take management fees and that, after the cure period had expired without action by Gray, the SPA obligated Gray to repurchase RMR stock owned by Bicknell. In Count II, Bicknell asserted a claim for contribution arising from loan guarantees signed by both parties. In his final counterclaim, Count III, Bicknell argued that Gray, as guarantor of the note held by Bicknell Properties, Inc., must cover any deficiency after foreclosure.

On December 9, 1994, the jury returned verdicts in favor of Bicknell on all counts except Gray's claim for breach of fiduciary duty. After the jury returned its verdict, Gray filed a Renewed Motion for Judgment as a Matter of Law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, contending that, as a matter of law, there was insufficient evidence to support Counts I and III

of Bicknell's counterclaim.  Specifically, Gray argued that he could not have an obligation under the SPA to repurchase Bicknell's RMR stock because the evidence was insufficient to show that Bicknell had provided adequate notice of an SPA breach.  Gray also argued that the evidence was insufficient to establish his obligation to pay the deficiency on a note he guaranteed because the merger doctrine operated to extinguish the debt when both the promissory note and the underlying real property came into Bicknell's control.  The district court found both of Gray's contentions to be without merit and denied the motion.

In addition to filing his Renewed Motion for Judgment as a Matter of Law, Gray also filed a motion for new trial under Federal Rule of Civil Procedure 59(a).  According to Gray, the district court made eight prejudicial errors in the course of the trial that, to be remedied, require a new trial.  The district court disagreed with all of the grounds offered by Gray and denied the motion for a new trial.  Gray now appeals.

**II.**

We review de novo a district court's denial of a renewed motion for judgment as a matter of law, applying the same standard as the district court.  Fox v. T-H Continental L.P., 78 F.3d 409, 413 (8th Cir. 1996); Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1505 (8th Cir. 1992).  A motion for judgment as a matter of law presents a legal question of "whether there is sufficient evidence to support a jury verdict."  Fox, 78 F.3d at 413 (citing White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992)).  It is properly granted only when the nonmoving party has not offered sufficient evidence "to support a jury verdict in his or her favor."  Abbott v. City of Crocker, 30 F.3d 994, 997 (8th Cir. 1994).  In evaluating such a motion, the court must: (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the

nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence would allow reasonable jurors to differ as to the conclusions that could be drawn. <u>Sherlock v. Quality Control Equip. Co.</u>, 79 F.3d 731, 735 (8th Cir. 1996).

**A.**

Through Count I of his counterclaim, Bicknell sought to compel Gray to buy back Bicknell's RMR stock in accordance with the stock transfer restriction agreement. Gray insists that the buy back provision was never triggered because, if he breached the SPA, he never received adequate notice of that breach.

In late June 1988, Gray received a registered letter from Bicknell's lawyer expressing "extreme concern about the Company, and the way it is being operated." Pl. Ex. 62. It continued by citing three problems: RMR's continuing payment of management fees to RMI (about $30,000 per month over three months), incomplete profit and loss statements provided to Bicknell prior to the stock purchase, and the "cannibalization" of customer base by a Raphael's opened in the vicinity of an existing restaurant. The letter went on to state:

> Ralph [Gray], trouble is brewing here! You stated during the negotiation stage that you didn't want to get into a legal hassle with Gene [Bicknell], and if that sort of possibility developed, you would just repurchase Gene's interest. In light of the above [three problems] and in light of Gene's present attitude, I suggest that you take immediate steps to accomplish the repurchase of Gene's shares, and real estate interest.

Pl. Ex. 62. It is this letter that Bicknell claimed, and the jury found, constituted notice of breach.

On appeal, Gray argues that, in light of the provisions of the SPA and Missouri law, this letter cannot be viewed as legally

–7–

adequate notice of breach.  While the letter lists Bicknell's grievances, it does not, Gray contends, unequivocally assert that a material breach occurred or that the contract was terminated.  He notes that the letter never mentions the SPA or uses the words "breach" or "termination."  He also notes that while the SPA provides only for a stock repurchase in case of breach and allows a twenty-day cure period, Bicknell's letter demands that Gray repay the $90,000 in management fees in eight days.  The intent of the letter is further confused, Gray argues, by Bicknell's concern with the future operation of RMR: if Bicknell wanted to trigger Gray's obligations to repurchase RMR stock, he would not care how RMR would be operated in the future because he would no longer have a stake.  We disagree with Gray's contentions.

In this diversity action, we follow the substantive law of Missouri.  See Burke v. Deere & Co., 6 F.3d 497, 511 (8th Cir. 1993), cert. denied, 114 S. Ct. 1063 (1994).  Under Missouri law, the nature of notice required by contract depends upon the provisions of that contract.  Baker v. Missouri Nat'l Life Ins. Co., 372 S.W.2d 147, 152 (Mo. App. 1963). Where the manner of exercising a power of termination is specified in a contract, notice will be effective only if given in the stated form, unless compliance has been waived.  Id.

According to the SPA, "Buyer's sole remedy for any and all damages . . . arising out of any misrepresentation . . . or any breach or default by Seller . . . shall be limited to the requirement of Seller to repurchase the Shares, pursuant to the terms and conditions contained in the Stock Transfer Restriction Agreement."  Pl. Ex. 12.  Section 7 of the Stock Transfer Restriction Agreement defines the terms of the repurchase.

> A. Breach by Gray.  If it is determined that Gray has made a material default of or under any of the representations, warranties, covenants, agreements or other provisions contained in that certain Stock Purchase

Agreement dated of even date between Gray and Bicknell, then Gray shall be bound to buy-back the Shares of Stock purchased by Bicknell . . . under the terms and conditions of this Section 7.;

B. <u>Notice of Breach</u>. Bicknell shall, promptly upon becoming aware thereof, give detailed written notice to Gray (the "Breach Notice") of the occurrence of, or the impending or threatened occurrence of, any event which would cause or constitute a breach;

C. <u>Cure Period</u>. Gray shall, for a period of twenty (20) days after his receipt of the Breach Notice have the opportunity to cure the existing breach.

Pl. Ex. 12.

Bicknell's letter meets the SPA's criteria for notice of breach. The letter explicitly states Bicknell's objection to the continuing payment of management fees to RMI which was a clear breach of the SPA. Under the SPA, "all management contracts between the company and Raphael Management Co., Inc., shall be terminated." Pl. Ex. 12. The letter also asks Gray to take immediate steps to repurchase Bicknell's shares. Nowhere does the SPA require Bicknell to state that the letter constitutes a breach notice or that Gray has twenty days to cure, and it is not our task to redraft the parties' contract to add procedural niceties that, in retrospect, one party would now prefer.

In addition, a notice of termination must be "clear, definite, unambiguous and unequivocal, and it properly may not be so characterized unless its meaning can be apprehended without explanation or argument" in order to be effective. <u>Baker</u>, 372 S.W.2d at 152 (internal quotations omitted). We do not find Bicknell's notice letter to be indefinite or unclear. In no uncertain terms, Bicknell, citing to the payment of management fees in violation of the SPA, requests that Gray repurchase his stock as Gray agreed to do. The fact that Gray can construct a clearer notice of breach by adding the words "breach" and "termination" to

Bicknell's letter does not mean that Bicknell's letter is inadequate. <u>Baker</u> does not require that notice of breach, to be effective, must be the clearest statement possible. While Bicknell certainly displays concern about the ongoing operation of RMR, this does not make his request that Gray repurchase his stock any less clear.[2]

## B.

Count III of Bicknell's counterclaim asks for damages in the amount of the deficiency that remained after Bicknell Properties, Inc. sold the Battlefield property in a foreclosure sale.

Gray and Bicknell jointly owned the Battlefield property, one of the three RMR restaurant sites. The property was encumbered by a deed of trust securing a note originally held by Community Federal Savings and Loan. Some time after RMR's bankruptcy on May 10, 1990, Bicknell Properties came to hold the deed of trust and note. When the note went into default, Bicknell Properties foreclosed on the Battlefield property and sold it in a foreclosure sale to Bicknell. The proceeds of the sale, however, did not fully cover the note. Bicknell Properties then assigned the foreclosure deficiency to Bicknell and Bicknell sued Gray to recover.

At trial, the jury found that Gray owed Bicknell the amount of the deficiency. Gray now argues that, as a matter of law, he has no obligation to pay Bicknell for the foreclosure deficiency because the merger doctrine operated to extinguish the debt. According to Gray, Bicknell effected a merger by purchasing the deed of trust while he remained the part-owner of the Battlefield

_____

[2]Under the SPA, Gray had twenty days to cure the breach. Had Gray done so, the repurchase provision would have been avoided and Bicknell would have remained an owner of RMR. Bicknell's demand for repayment in eight days, while not following the terms of the SPA, does not undermine the clarity of the letter's purpose.

property.  Gray cannot succeed in this argument.

The merger doctrine acts to merge the equitable title to real property into the legal title, thereby destroying the lesser estate.  <u>Riggs v. Kellner</u>, 716 S.W.2d 3, 5 (Mo. App. 1986).  Under Missouri law, when the owner of a fee of land which is subject to an encumbrance acquires the encumbrance, that encumbrance is extinguished by merger.  <u>Stevenson v. Stevenson</u>, 618 S.W.2d 715, 718 (Mo. App. 1981).  Because merger is an affirmative defense, it must be raised in the pleadings or waived.  <u>See</u> Fed. R. Civ. P. 8(c); <u>see also</u> <u>Overholt Crop Ins. Serv. Co. v. Travis</u>, 941 F.2d 1361, 1368 (8th Cir. 1991).  Gray failed to raise the doctrine of merger at trial and therefore it is waived.[3]

## III.

Gray asserts that the district court made eight prejudicial errors which require a new trial to be remedied.  The authority to

_____

[3]In addition, the evidence does not indicate that there was a merger of ownership of the equitable and the legal title to the Battlefield property since Bicknell Properties acquired the deed of trust whereas Gray and Bicknell owned the real property individually.  Order at 2.  Missouri law unambiguously requires that "legal title and the mortgage lien must vest in one and the same person" in order to effect a merger.  <u>City of Gallatin v. Feurt</u>, 50 S.W.2d 1027, 1030 (Mo. 1932).

Gray acknowledges that unity of ownership in the strict sense of the concept did not occur, but argues that "the fact that Bicknell accomplished this goal [the purchase of the Battlefield property deed of trust] through the form of transferring the property to a corporation which he wholly owned or controlled, should not defeat the merger."  Appellant's Br. at 24.  Gray asks us to ignore the legal distinction between Bicknell and Bicknell Properties by piercing the corporate veil; however, he has offered no sound reason to do so.  Absent a showing that Bicknell Properties served merely as an alter ego of Bicknell through piercing of the corporate veil, we accept that Bicknell and Bicknell Properties are the separate legal entities they purport to be, and therefore no merger could be demonstrated under the facts of this case.

-11-

grant a new trial is within the discretion of the district court. <u>Citizens Bank of Batesville, Ark. v. Ford Motor Co.</u>, 16 F.3d 965, 967 (8th Cir. 1994). Federal Rule of Civil Procedure 59 confirms the trial court's historic power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict. <u>Smith v. Transworld Drilling Co.</u>, 773 F.2d 610, 612 (8th Cir. 1985). A new trial is appropriate when the first trial, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial, resulted in a miscarriage of justice. <u>See</u> <u>White v. Pence</u>, 961 F.2d 776, 780 (8th Cir. 1992); <u>Fireman's Fund Ins. Co. v. AALCO Wrecking Co.</u>, 466 F.2d 179, 187 (8th Cir. 1972), <u>cert. denied</u>, 410 U.S. 930 (1973). We review the trial court's denial of a new trial under an abuse of discretion standard. <u>Citizens Bank</u>, 16 F.3d at 967.

**A.**

Aside from seeking judgment as a matter of law on Bicknell's Counts I and III, Gray also moved for a new trial on the basis that submission of Bicknell's Counts I and III to the jury amounted to prejudicial error. The district court found Gray's positions to be without merit and denied the motion, noting that "the evidence adduced at trial support submitting Counts I and III of defendant's counterclaims to the jury." Order at 9. On appeal, Gray argues that the district court, by submitting Counts I and III to the jury, "allowed numerous collateral issues and irrelevant evidence to taint and confuse the jury." Appellant's Br. at 26. According to Gray, this error mandates a new trial.

We do not agree. The issues and evidence introduced on the basis of Counts I and III are, by and large, central to the complicated contractual dispute between Gray and Bicknell. To the degree that "collateral issues and irrelevant evidence" can be traced solely to Counts I and III, Gray offered no reason to believe that it disrupted the jury's deliberative process or that

-12-

it resulted in prejudice to his cause.  We are not willing to hold that the district court abused its discretion on such thin proof.

**B.**

On December 28, 1993, Gray filed a Motion for Leave to File a Fourth Amended Complaint under Rule 15(a) of the Federal Rules of Civil Procedure in which he sought to add two claims.  First, Gray made a prima facie tort claim as an alternative to his claim that Bicknell breached a fiduciary duty owed to him.  Second, he asked for an award of punitive damages based on the breach of fiduciary duty claim and the prima facie tort claim, alleging that Bicknell acted with an evil motive or reckless indifference.  The district court denied the motion.  At the end of the testimony, Gray moved, under Rule 15(b) of the Federal Rules of Civil Procedure, to amend the pleadings to conform to the evidence during trial.  This, too, was denied.

Gray then filed a motion for new trial on the basis of the denial of leave to amend the complaint.  The district court denied this motion as well.  The court ruled that "plaintiff has failed to state a cause of action against defendant for prima facie tort, and that the evidence at trial failed to show any actions by defendant that proved any intent on the part of defendant to injure plaintiff or to act with an evil motive."  Order at 3.  Additionally, the court noted that Gray's request to file a fourth amended complaint occurred after the close of discovery and that granting the motion would have caused further delay in a case overdue for trial.

Gray appeals, arguing that he had offered evidence sufficient to support his prima facie tort claim and his punitive damages claim, and that the Federal Rules of Civil Procedure's liberal view to amending pleadings required the district court to grant his motion for a new trial.  In denying the motions, according to Gray, the district court abused its discretion.  Because the claims Gray

sought to add lacked substance, we believe the court acted within its discretion in denying Gray's motion to amend.

Under Missouri law, a prima facie tort consists of four elements: (1) an intentional, lawful act by the defendant, (2) an intent to cause injury by the defendant, (3) injury to the plaintiff, and (4) an absence of justification or an insufficient justification for the defendant's act. Bandag of Springfield v. Bandag, Inc., 662 S.W.2d 546, 552 (Mo. App. 1984). The evidence presented at trial did not establish the components of a prima facie tort claim. There is no compelling proof that Bicknell intended to cause injury to Gray or that Bicknell acted without legitimate business justifications.

Nor can it be said that the prima facie tort claim was tried by the implied consent of the parties. Gray asserts that he "presented sufficient evidence to support his claims for prima facie tort . . . during trial." Appellant's Br. at 49. Even if Gray had presented sufficient evidence, a Rule 15(b) amendment to conform with the evidence requires some level of consent by both parties. See Pariser v. Christian Health Care Sys., Inc., 816 F.2d 1248, 1253 (8th Cir. 1983). There has been no consent by Bicknell. Many of the issues in a prima facie tort claim are duplicative of issues in other properly pled claims. See id. Furthermore, the district court's denial of Gray's motion to file a fourth amended complaint clearly placed the prima facie tort claim outside of the proper considerations at trial.

The evidential support for a punitive damage claim is also lacking. Punitive damages require a showing of a culpable mental state on the part of the defendant, either by a wanton, willful, or outrageous act, or reckless disregard for an act's consequences. See Burnett v. Griffith, 769 S.W.2d 780, 787 (Mo. banc 1989). If the evidence failed to show that Bicknell placed RMR into bankruptcy and took other actions to harm Gray, then it surely

-14-

cannot go further and show a higher degree of culpability.

## C.

In the course of providing discovery documents, Bicknell gave Gray two letters written to Bicknell by his attorney. The letters addressed a wide range of matters relating to the litigation. Both sides agree that absent this disclosure, the letters would have been subject to attorney-client privilege. Gray maintained that Bicknell intended to produce the letters, thereby deliberately and voluntarily waiving his attorney-client privilege with respect to all related documents. Bicknell countered that the litigation involved vast numbers of documents and that, in the course of responding to document requests, paralegals inadvertently included the letters. Bicknell argues that he waived his attorney-client privilege only with respect to those two letters. The district court agreed with Bicknell and held that the disclosure of the letters was inadvertent and that attorney-client privilege continued to protect other, related, documents.

In his motion for a new trial, Gray challenged the district court's ruling on the scope of Bicknell's attorney-client privilege, asserting that his right to a fair trial was materially prejudiced by the district court's denial of his request to review the files and records of Bicknell's attorney. The district court denied the motion. Noting that the Eighth Circuit had yet to define how inadvertent disclosure affects attorney-client privilege, the court followed what it called the "middle of the road" approach which involved an ad hoc balancing of several factors. Order at 5.

On appeal, Gray argues that the district court erred in

employing the "middle of the road" approach.[4]  We note initially that the district court is in error when it looks to federal common law precedent to assess whether Bicknell inadvertently waived his attorney-client privilege.  In diversity actions, state law determines the existence and scope of attorney-client privilege.  Fed. R. Evid. 501; see also Simon v. G.D. Searle & Co., 816 F.2d 397, 402 (8th Cir.), cert. denied, 484 U.S. 917 (1987).  Under Missouri law, documents falling within the attorney-client privilege cannot be discovered absent waiver.  Mo. R. Civ. P. 56.01(b)(1).  A voluntary disclosure of information which is inconsistent with the confidential nature of the attorney-client relationship waives the privilege.  State ex rel. Chase Resorts, Inc. v. Campbell, 913 S.W.2d 832, 838 (Mo. App. 1996); Lipton Realty, Inc. v. St. Louis Hous. Auth., 705 S.W.2d 565, 570 (Mo. App. 1986).  The ramification of inadvertent disclosure are less clear.  Neither the Missouri legislature nor the courts have had occasion to address the degree to which inadvertent disclosure of privileged documents constitutes waiver.  Where a state court has yet to decide an issue, we must place ourselves in the position of the state supreme court and determine how that institution would likely resolve the matter.  See B.B. v. Continental Ins. Co., 8 F.3d 1288, 1291 (8th Cir. 1993).

As noted by this Court in Pavlik v. Cargill, Inc., 9 F.3d 710,

---

[4]On appeal from the denial of a new trial, Gray makes two other arguments: (1) the district court erred in determining that Bicknell inadvertently disclosed the letters, and (2) the district court erred in its application of the "middle of the road" test to the facts of this case.

Given the deference afforded district court denials of new trial, these arguments must be rejected.  It cannot be said that the district court abused its discretion in finding the disclosure to be inadvertent.  Nor is Gray persuasive in arguing that the court, when applying the "middle of the road" test, failed to properly consider the impact of the disclosed information.  See Hydraflow, Inc. v. Enidine Inc., 145 F.R.D. 626, 637 (W.D.N.Y. 1993).

-16-

713 (8th Cir. 1993), courts have generally followed one of three distinct approaches to attorney-client privilege waiver based on inadvertent disclosures: (1) the lenient approach, (2) the "middle of the road" approach, which is also called the Hydraflow approach, and (3) the strict approach.

Under the lenient approach, attorney-client privilege must be knowingly waived. Here, the determination of inadvertence is the end of the analysis. The attorney-client privilege exists for the benefit of the client and cannot be waived except by an intentional and knowing relinquishment. Georgetown Manor, Inc. v. Ethan Allen, Inc., 753 F. Supp. 936, 938 (S.D. Fla. 1991); see also Mendenhall v. Barber-Greene Co., 531 F. Supp. 951, 954 (N.D. Ill. 1982) (holding that the better rule is that mere inadvertent production does not waive attorney-client privilege). This Court has reasonably rejected this approach and we believe that the Missouri Supreme Court would do so as well. See Lutheran Medical Ctr. v. Contractors, Laborers, Teamsters & Eng'rs Health & Welfare Plan, 25 F.3d 616 (8th Cir. 1994); Pavlik, 9 F.3d at 713. The lenient test creates little incentive for lawyers to maintain tight control over privileged material. While the lenient test remains true to the core principle of attorney-client privilege, which is that it exists to protect the client and must be waived by the client, it ignores the importance of confidentiality. To be privileged, attorney-client communications must remain confidential, State v. Lingar, 726 S.W.2d 728, 740 (Mo.), cert. denied, 484 U.S. 872 (1987); Lipton Realty, Inc., 705 S.W.2d at 570, and yet, under this test, the lack of confidentiality becomes meaningless so long as it occurred inadvertently.

The second approach is known as the strict test. Gray urges the Court to adopt such a test and refers to In re Sealed Case, 877 F.2d 976 (D.C. 1989), a case describing the D.C. Circuit's strict test. In re Sealed Case creates a strong incentive for careful document management, stating that "[t]he courts will grant no

-17-

greater protection to those who assert the privilege than their own precautions warrant." Id. at 980. Under the strict test, any document produced, either intentionally or otherwise, loses its privileged status with the possible exception of situations where all precautions were taken. Once waiver has occurred, it extends "'to all other communications relating to the same subject matter.'" Id. at 981 (quoting In Re Sealed Case, 676 F.2d 783, 809 (D.C. Cir. 1982)); Texaco Puerto Rico v. Dep't of Consumer Affairs, 60 F.3d 867 (1st Cir. 1995).

While the strict test has some appeal in that it makes attorneys and clients accountable for their carelessness in handling privileged matters, we believe that Missouri courts would reject it because of its pronounced lack of flexibility and its significant intrusion on the attorney-client relationship. See State ex. rel Great Am. Ins. Co. v. Smith, 574 S.W.2d 379, 383 (Mo. 1978). The strict test sacrifices the value of protecting client confidences for the sake of certainty of results. Hydraflow, Inc. v. Enidine Inc., 145 F.R.D. 626, 637 (W.D.N.Y. 1993). There is an important societal need for people to be able to employ and fully consult with those trained in the law for advice and guidance. State ex rel. Great Am. Ins. Co., 574 S.W.2d at 383. The strict test would likely impede the ability of attorneys to fill this need by chilling communications between attorneys and clients. If, when a document stamped "attorney-client privileged" is inadvertently released, it and all related documents lose their privileged status, then clients will have much greater hesitancy to fully inform their attorney.

Finally, there is the middle test, sometimes called the Hydraflow test, which served as the basis for the district court's position. Hydraflow, 145 F.R.D. at 637.[5] Under the Hydraflow

_____

[5]This is what the district court referred to as the "middle of the road" approach. Order at 5.

-18-

test, the court undertakes a five-step analysis of the unintentionally disclosed document to determine the proper range of privilege to extend. These considerations are (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of document production, (2) the number of inadvertent disclosures, (3) the extent of the disclosures, (4) the promptness of measures taken to rectify the disclosure, and (5) whether the overriding interest of justice would be served by relieving the party of its error. Id.; see also Alldread v. City of Grenada, 988 F.2d 1425, 1433 (5th Cir. 1993). If, after completing this analysis, the court determines that waiver occurred, then those documents are no longer privileged. At the court's discretion, the privilege may also be determined to have been waived for related, but-as-yet undisclosed, documents.

We believe that Missouri courts would adopt the middle test. This test strikes the appropriate balance between protecting attorney-client privilege and allowing, in certain situations, the unintended release of privileged documents to waive that privilege. The middle test is best suited to achieving a fair result. It accounts for the errors that inevitably occur in modern, document-intensive litigation, but treats carelessness with privileged material as an indication of waiver. The middle test provides the most thoughtful approach, leaving the trial court broad discretion as to whether waiver occurred and, if so, the scope of that waiver. It requires a detailed court inquiry into the document practices of the party who inadvertently released the document. We therefore conclude that the district court did not abuse its discretion in refusing to grant a new trial.

**D.**

At trial, Gray's attorney sought to question Bicknell about the meaning and effect of a joint venture agreement (JVA) that the parties entered into some months after the three central

-19-

agreements, but was prohibited from doing so because the district court sustained an objection from Bicknell's attorney.[6]  The JVA provided that in the event that either party wished to terminate the JVA, one party could compel the other to either buy or sell his one-half interest in the real estate.  Pl. Ex. 329, sec. 6.  According to Gray, this JVA provision supported his view that a breach of the SPA was expressly excluded as a basis for terminating obligations created by the REA.  In this appeal, Gray

---

[6]During the trial, Mr. Mann, representing Bicknell, objected to the cross-examination of Bicknell by Gray's attorney, Mr. Stingley, on the relationship between the JVA and the other three contracts.  The following bench conference ensued.

MR MANN: This joint venture agreement, which the Court has admitted into evidence over my objection, is not an issue in this case.  There is no claim for any breach of that agreement, so this is clearly going beyond any relevancy.  He's admitted it was executed.  It's already been admitted into evidence.  To ask this witness what his understanding of the interrelationship between a number of agreements, one of which is there is no claim for in this proceeding, is simply irrelevant and it is obviously designed to try to confuse the witness.

MR. STINGLEY: Your Honor, a week ago, when we introduced the joint venture agreement, we told you, and we stand by it, we're not bringing a cause of action on the joint venture agreement, we agree.  But it deals with the Battlefield property and what the rights were between the parties.  It also has buy-out provisions.  We didn't sue Mr. Bicknell.  We told you wouldn't amend the pleadings.  We never amended - - moved to amend the pleadings to ask for a cause of action against that.  But Mr. Bicknell said I executed four agreements.  He said that an hour ago.  Now, he says three are interrelated and obviously that means one of them is not.  I think we're entitled to know is it one of the three, or is it the joint venture agreement, or which one stood independent.

THE COURT: I think it's confusing, a collateral issue.  I'll sustain the objection.

VIII Trial Tr. at 38-39.

-20-

contends that the district court erred in cutting short this line of questioning.

While it is true that the REA and the JVA concern the same real estate and that the JVA establishes a mechanism for ending the tenancy in common between Gray and Bicknell should either party wish, the district court did not abuse its discretion by refusing to allow Bicknell to be cross-examined on the subject. The JVA was absent from Gray's pleadings. If the court had admitted more evidence concerning the JVA, there would have been substantial risk of confusing the jury or allowing the jury to find for Gray based on the JVA despite its absence from the pleadings. The district court has broad discretion in deciding questions of evidence, and we believe it acted with the reasonable grounds of that discretion.

**E.**

Gray asserts that his right to a fair trial was materially prejudiced by the district court's improper instructions to the jury. He enumerates five specific errors: (1) the instructions concerning material breach, (2) the instructions concerning Bicknell's affirmative defenses of failure to perform, (3) the instructions concerning Gray's waiver and estoppel "avoidance of defenses," (4) the verdict directing instruction on Bicknell's Count I, and (5) the instructions concerning Gray's affirmative defense to all of Bicknell's counterclaims.

The purpose of instructing the jury is to focus attention on the essential issues of the case. The district court has broad discretion to instruct the jury in the form and language it considers fair and adequate to present the substantive law. Grogan v. Garner, 806 F.2d 829, 836 (8th Cir. 1986); James E. Brady & Co., Inc. v. Eno, 992 F.2d 864, 868 (8th Cir. 1993). A party is entitled to an instruction reflecting that party's theory of the case if the instruction is legally correct and there is evidence to support it. Bursch v. Beardsley & Piper, 971 F.2d 108, 112 (8th Cir. 1992). A party is not, however, entitled to a specific formulation of an instruction. United States v. Ribaste, 905 F.2d

1140, 1143 (8th Cir. 1990).

In reviewing the district court's instructions, we consider whether the charges, taken as a whole and viewed in light of the  evidence and the applicable law, fairly and adequately submitted the issues in the case to the jury.  Jones v. Board of Police Comm'rs, 844 F.2d 500, 504 (8th Cir. 1988), cert. denied, 490 U.S. 1092 (1989).  We will not reverse absent harmful error.  There is no harmful error if the charge, in general, correctly instructs the jury, even if one portion is technically incorrect. Westborough Mall, Inc. v. City of Cape Girardeau, 794 F.2d 330, 335 (8th Cir. 1986), cert. denied, 480 U.S. 918 (1987).  "'The test is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues.'"  Id. (quoting Houston v. Herring, 562 F.2d 347, 359 (5th Cir. 1977) (per curiam)).

**i.**

In jury instruction nos. 9, 16, 23 and 35, the court defined a material breach of a contract as "the failure to perform a promise contained in the contract which is essential to the agreement of the parties."  Gray argues that this instruction is legally erroneous. According to Gray, a fact finder considering the question of materiality must consider five particular circumstances under Missouri law.[7]  This is incorrect.  See

---

[7]"Among the significant circumstances that guide the finder of fact in that determination [of materiality] are: (1) the extent to which the injured party will be deprived of a reasonably expected benefit, (2) the extent to which the injured party can be compensated for the part of that deprived benefit, (3) the extent to which the party failing to perform will suffer forfeiture, (4) the likelihood that the party failing to perform will cure that failure, and (5) the extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing."  McKnight v. Midwest Eye Inst., 799 S.W.2d 909, 915 (Mo.
App. 1990); see also Restatement (Second) of Contracts § 241 (1981).

-23-

<u>McKnight v. Midwest Eye Inst.</u>, 799 S.W.2d 909, 915 (Mo. App. 1990) (noting that the five factors are only significant circumstances that guide the fact finder in evaluating whether a breach is material).  While Missouri recognizes the validity of the five circumstances as guides to understanding materiality, it does not require that the five circumstances be included in a materiality jury instruction.  While we agree that the alternative instruction offered by Gray certainly provides the jury with a more detailed definition of materiality, that is not the standard by which we review jury instructions.  The court's instruction on materiality fairly and accurately defined materiality in a fashion that did not mislead or confuse the jury and that is sufficient.

**ii.**

Gray contends that the district court erred by submitting instruction nos. 18 and 25 to the jury because they allowed the jury to find that Gray's breach of the SPA could be an affirmative defense to Counts II and III of Gray's complaint.[8]  Gray contends that the court should have found, as a matter of law, that a breach of the SPA could not constitute a defense to Gray's claims under the REA.

The language of the REA indicates otherwise.  The relevant portion of the REA states:

> The performance of this Real Estate Agreement is specifically conditioned upon and is to run concurrently

---

[8]Jury instruction nos. 18 and 25 are lengthy, five-point explanations of the law.  Gray objects to the initial language in each that states, "Your verdict must be for the defendant on Count II (or III) of plaintiff's claims if you believe: First, the Stock Purchase Agreement and the Real Estate Agreement are concurrent Agreements such that a breach of one is a breach of the other."

-24-

with the completion and consummation of the terms of an Agreement executed concurrently with this Real Estate Agreement . . . wherein Ralph L. Gray agrees to sell and Buyer agrees to purchase five hundred (500) shares of the issued and outstanding stock of Raphael's #1, Inc., a Missouri corporation. If for any reason, other than breach by the parties, the said Agreement is not consummated, then this Real Estate Agreement shall become immediately null and void, and thereafter shall be of no force or effect.

Gray latches on to the final sentence of the REA provision, maintaining that it provides clear and unambiguous language precluding the use of a breach of the SPA as a defense to Gray's REA claims. In light of the entire provision, however, it is apparent that the parties intended the REA to be conditioned on the completion and consummation of the SPA. Additionally, Gray's argument simply ignores that voiding a contract is entirely distinct from nonperformance excused by breach. See Williston on Contracts, 3d ed. § 1305; Village of Cairo v. Bodine Contracting Co., 685 S.W.2d 253, 260 (Mo. App. 1985); Whitman v. Livingston, 541 S.W.2d 61, 63 (Mo. App. 1976). Accordingly, the district court did not error in submitting instruction nos. 18 and 25 to the jury.

Gray also complains that jury instruction nos. 11, 18 and 25, which addressed Bicknell's affirmative defense that Gray had failed to perform on the contract, allowed the jury "a roving commission" to conclude that Gray breached his duty of good faith and fair dealing by continuing to take management fees after the closing of the SPA. Appellant's Br. at 41. Instead, Gray argues the court should have employed instruction B, which excluded lack of good faith as a ground for Bicknell's affirmative defense.

We find nothing improper or prejudicial in these instructions. They explain in a clear and detailed fashion what the jury must find in order to conclude that Gray's ongoing receipt of management fees relieved Bicknell of his contractual duties. These instructions comport with Missouri contract law and are justified

by the evidence introduced at trial.

### iii.

Finally, Gray asserts three additional errors in the jury instructions. We have reviewed the instructions, trial record, and applicable law and conclude that these jury instructions meet the legal standard. While they may not be the instructions Gray hoped for, they are sufficient to satisfy abuse of discretion review. We reiterate that the test for reviewing a jury instruction is not whether the instruction was faultless, but whether the instruction misled the jury in any way. See Westborough, 794 F.2d at 335. Gray is not entitled to a specific formulation for the instructions. See Ribaste, 905 F.2d at 1143. The instructions challenged by Gray are both legally sound and syntactically clear.

### F.

During the course of their deliberations, the jury submitted the following question to the court: "If one partner believes the other partner has breached the contract, but does not immediately resign from the corp. or sue does this mean the breach is null & void." II App. at 408 (emphasis in original). In response, the court answered:

> It is for you to decide whether a material breach has occurred. In reaching that decision, you must refer to instruction number nine, which is repeated in other packets. [I]f you find a material breach has occurred, the failure to immediately resign from the corporation or sue does not mean the breach is null and void. It is for you to decide whether the breach has been waived or whether a party is estopped from asserting the breach. In making that decision, you must refer to instructions numbers 12 and 13, which are repeated in other packets.

X Trial Tr. at 1.

On appeal, Gray maintains that the court should have inserted the word "automatically" into its answer.  That is to say, the answer should have read, "If you find a material breach has occurred, the failure to resign from the corp. or sue does not <u>automatically</u> mean the breach is null and void."  Without the word "automatically," Gray believes the court's answer caused the jury to believe that it could not infer that Bicknell's failure to act could waive or estop the breach.

One need only consider the answer as a whole to realize that Gray's contention is meritless.  The court expressly directed the jury that it was their duty to decide whether Bicknell waived or was estopped on Gray's breach of contract.  Further, the answer directed the jury's attention to instruction nos. 12 and 13, which state that the finding must be for Gray on his failure to perform claim if the "defendant did not indicate to plaintiff, by words or conduct, that plaintiff was thereby materially breaching the stock purchase agreement."  II App. at 367.  The district court did not mislead the jury when it gave this answer.

**IV.**

Bicknell brings a cross-appeal, arguing that Gray lacks standing to make an individual claim for breach of fiduciary duty against Bicknell.

At trial, Gray prevailed only on his breach of fiduciary duty claim.  Gray contended that Bicknell, as an officer and director of RMR, had a fiduciary duty to protect Gray's interests.  In his third amended complaint, Gray alleged that:

> As a result of Defendant's breach of his fiduciary duty as an officer and director and failure to manage the Companies, (a) the Companies were adjudicated bankrupt and the Stock of [RMR] is now without value; (b) Plaintiff lost all equity in real estate used by the

-27-

Companies; and (c) Plaintiff is liable on his personal guarantees.

I App. at 92.

In a motion for partial summary judgment, Bicknell challenged Gray's standing to bring a breach of fiduciary duty claim. He argued that Gray cannot have standing in this instance because the harm suffered by Gray from Bicknell's alleged breach of fiduciary duty was not different and distinct from that suffered by shareholders generally. As such, Bicknell contended that this claim can only be made in the context of a derivative action in the name of the corporation. The district court denied Bicknell's motion for summary judgment, holding that "because plaintiff has set forth facts alleging that he was individually harmed as a result of defendant's failure to perform his fiduciary duty as an officer and director, plaintiff has standing to sue individually." I App. at 228-29.

The general rule in Missouri is that, in breach of fiduciary duty suits, individual shareholders must sue corporate directors and officers derivatively. Delahoussaye v. Newhard, 785 S.W.2d 609, 613 (Mo. App. 1990). Only under specific circumstances may an individual pursue such an action directly. Gieselmann v. Stegeman, 443 S.W.2d 127 (Mo. 1969); Grogan v. Garner, 806 F.2d 829 (8th Cir. 1986). The chief point of contention for the parties is the scope of the exception and whether the damages alleged by Gray come within its scope.

Gray relies on Gieselmann and Grogan to define the exception. Under these cases, the key element of being able to sue a corporation directly is individual injury separate and apart from any injury the stockholder qua stockholder sustains. The difficult part of this analysis lies in characterizing the injury claims. In this case, Gray sets out three injuries that stemmed from

-28-

Bicknell's breach of fiduciary duty: (1) RMR was adjudicated bankrupt and Gray's stock lost all value, (2) Gray lost all equity in real estate used by RMR, and (3) Gray became liable on personal guarantees of RMR's debt.

The bankruptcy claim rests on the assertion that Bicknell failed to properly oversee and direct RMR or deal with the management problems the corporation was experiencing, causing RMR to enter bankruptcy. Appellee's Br. at 16. This is not an independent personal injury. The fact that the bankruptcy caused Gray's RMR shares to lose all value would apply equally to every other shareholder. Bicknell had a duty of care to the corporation and, through the corporation, to all shareholders. Accepting that he violated his fiduciary obligations, the violation in no way impacted Gray in a manner different than the corporation as a whole. The fact that this corporation has only two shareholders does not affect the analysis. See Jones v. Rennie, 690 S.W.2d 164, 166 (Mo. App. 1985).

The other two harms, loss of equity in real estate leased to RMR and personal liability on loan guaranties on corporate debt, clearly exist independently of any harm suffered by the corporation. Gray had a unique situation with respect to the corporation and as a result he suffered losses. These harms are of the individual type required for the direct injury exception.

There is, however, no link between the breach of fiduciary duty and the individual harms claimed. As a director and officer of RMR, Bicknell has a fiduciary duty to protect the interests of the corporation and its shareholders. That duty does not extend to outsiders who are tied to the corporation through contractual relationships such as loan guarantee agreements or real estate leases. Rather, a director's duties to outside parties, if any, must be contractually based. When a person wears two hats so that he is both a shareholder and an outsider interested in corporate

decisions, the fiduciary duty exists only with respect to shareholders qua shareholders.  The fiduciary duty does not extend to the shareholder when he is acting in the role of an outsider.

With respect to the individual injuries asserted by Gray, he is a corporate outsider.  Therefore, Bicknell owed Gray no fiduciary duties with respect to these claimed individual injuries.

Gray admits that this disjuncture exists between the scope of the fiduciary duty and the harms claimed.  He believes it is of no consequence, however.  Citing <u>Grogan</u>, Gray states that "once individual harm was found, Gray had standing to recover damages for <u>any</u> individual injury suffered as a result of Bicknell's breach."  Appellant's Reply Br. at 19.  In other words, it is Gray's position that a shareholder can sue on any injury suffered as a consequence of a breach of fiduciary duty regardless of whether the duty was owed with respect to the harm claimed.

The facts of <u>Grogan</u> make it inapposite to this case.  <u>Grogan</u> involved misleading statements made by the president of the corporation to the shareholders about an offer to buy the company.  The actions between the defendant and the plaintiff that give rise to the harm are the very same actions that constitute the breach of fiduciary duty.

While Missouri courts have not expressed a clear position on whether the harm in a breach of fiduciary duty claim must concern a matter protected by the duty itself, we conclude that this link between the duty and the harm must exist.  Other courts have stated in definitive language that the breach of duty must relate to the harm claimed to be actionable. <u>See</u> <u>In re Ballantyne</u>, 166 B.R. 681, 687 (E.D. Wis. 1994); <u>McGivern v. AMASA Lumber Co.</u>, 252 N.W.2d 371, 380 (Wis. 1977).  Since there is no such link in these two claims, we reverse the district court and hold that Gray lacks standing to bring an individual action on a breach of fiduciary duty claim.

## V.

We hold that, when considering the possibility of waiver of attorney-client privilege through inadvertent disclosure, the middle balancing test applies and that, under this analysis, the district court did not abuse its discretion in determining that Bicknell did not waive his privilege. We find the other claims raised by Gray on appeal unpersuasive and we affirm the district court.

We agree with Bicknell's assertion that Gray lacks standing to bring his individual claim against Bicknell for breach of fiduciary duty. Under Missouri law, an individual action for breach of fiduciary duty requires an individual injury and a nexus between the injury and the breach of fiduciary duty, and Gray did not establish facts that met this standard. On this basis, we affirm in part and reverse in part.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.