Leonard J. ROSATI, Plaintiff,

v.

CLEVELAND–CLIFFS, INC., Defendant.

No. CIV.01–1937 RLE.

United States District Court, D. Minnesota.

March 21, 2003.

H. Jeffrey Peterson, Andrew R. Peterson, Cope & Peterson, Virginia, MN, for Plaintiff.

Robert Thomas Torgerson, Hanft Fride, Duluth, MN, James A. Rydzel, W. Eric Baisden, Jones Day, Cleveland, OH, for Defendants.

## ORDER

ERICKSON, United States Magistrate Judge.

At Duluth, in the District of Minnesota, this 21st day of March, 2003.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, as authorized by Title 18 U.S.C. § 636(c), upon the parties' cross-Motions for Summary Judgment, and upon the Plaintiff's Motion for a Jury Trial.

At a Hearing on the Motions, the Plaintiff appeared by H. Jeffrey Peterson, and Andrew R. Peterson, Esqs., and the Defendant appeared by Robert T. Torgerson, and W. Eric Baisden, Esqs.

For reasons which follow, we grant the Defendant's Motion for Summary Judgment, deny the Plaintiff's Motion for Summary Judgment, deny the Plaintiff's informal Motion for Leave to Amend his Complaint, and deny the Plaintiff's Motion for a Jury Trial, as moot.

### II. *Factual and Procedural History*

This action arises out of an announcement, on May 24, 2000, that LTV Steel Mining Company ("LTV") would be closing its facilities in Hoyt Lakes, Minnesota. The Defendant Cleveland–Cliffs, Inc. ("CCI"), managed LTV, and the Plaintiff was a CCI employee, who had been assigned, by CCI, to work at LTV.

As part of LTV's closure, CCI employees, who worked at LTV, were informed that, if they elected to retire, by no later than June 30, 2000, they would be entitled to receive monthly payments of $400.00, until they reached the age of 62, as a supplement to their retirement benefits. However, CCI also identified several "key" employees, who it needed to remain at LTV through the closing, and it offered

those employees an incentive to remain at LTV after the deadline of June 30, 2000. Those key employees were warned that, if they elected to remain employed after that date, they did so with no guarantee of a permanent position at CCI. The incentives that those employees would receive, for opting to stay, were outlined in a document entitled "Benefits for Cliffs Mining Company and Cliffs Mining Services Company Employees Who are Terminated As a Result of the Shutdown of LTV Steel Mining Company" (the "Plan").

The Plan explained that, "[a]s a result of the shutdown of LTV * * * [CCI] salaried employees at LTV * * * will become eligible for the" benefits contained in the Plan, "by continuing to *work until their employment is terminated.*" See, *Exhibit A attached to Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment,* at 1 [emphasis in original]. Under the Plan, "[e]very eligible employee w[ould] receive six months of basic severance pay continuation regardless of age and service." *Id.* The Plan also provided for three different severance pay supplements, with differing eligibility requirements.

The first of those supplements was the "70/80 Supplement," which is the one to which the Plaintiff believes that he is entitled. The 70/80 Supplement provides that employees whose years of service and age, when added together, total eighty or more[1] as of the end of the "Termination Period," were entitled to a $400.00 monthly supplement, until they reached the age of sixty-two. *Id.* The "Termination Period" was defined as "the six-month period which begins on the day following a salaried employee's employment termination on account of the shutdown of LTV Steel Mining Company." *Id.*[2] After reciting the various supplemental benefits, the Plan continued with provisions concerning the medical and life insurance benefits, vacation pay, and outplacement assistance programs, that were provided under the Plan. *Id.* at 2.

The next section of the Plan was entitled "Eligibility for Severance Benefits and Pension Enhancements." The first provision under that section was entitled "Offer of Continued Employment with a 'CCI Associated Employer,'" which was further divided into three subdivisions. *Id.* The first subdivision read as follows:

> If offered a "generally equivalent position" (before actual layoff) with same base pay and incentive opportunity, which is in Northeastern Minnesota, such employment offer shall cause the incumbent to be "ineligible" for basic severance pay and/or special retention benefits (but shall not cause ineligibility for 70/80 [or] Rule of 65 pension[s] if otherwise eligible).

*Id.*

The second subdivision, provided as follows:

---

1. When the Plaintiff left CCI, he was over fifty years of age, and he had over thirty years of service with the company.

2. In addition, the Plan had a "Rule of 65 Supplement," which provided the same monthly benefit to persons who "ha[d] at least 20 years of continuous service as of the last day worked * * * and years of service and age that total 65 or more but less than 80 as of the end of the 'Termination Period.'" However, under that provision, the monthly supplement was subject to a reduction of $1.00 for every $2.00 "of income earned after retirement which exceed[ed] $17,000 in a calendar year." *Plan,* at 1. The third Supplement was the "30–Year Retirement" Supplement, which was available for persons who were "eligible for a 30–Year Early Retirement benefit," and provided that such persons would receive their "pension benefit at the date of retirement rather than at the end of the 'Termination Period.'"

If offered a position that is "not generally equivalent" and/or a position that requires relocation from [the employee's] primary residence, outside of Northern Minnesota, [the] incumbent will have the option to: a) accept position with appropriate relocation assistance in lieu of basic severance pay and special retention benefits or b) elect voluntary termination with basic and special retention benefits.

*Id.*

Finally, the third subdivision read as follows:

If offered employment with a CCI Associated Employer after [the] incumbent begins layoff and such employment (including relocation, if necessary) is accepted, the CCI employment shall serve as a mitigating event to the basic severance pay.

*Id.*

The Plan then provided information concerning whether the pension plan of an eligible employee, who accepted employment with a CCI associate employer after being terminated from LTV, would be fully credited in that new employment. Finally, the Plan provided information concerning the impact of the IRS Pension Plan Rules on the form of benefits payments under the Plan, noting that some employees' payments might be "in the form of a lump sum present value" payment, instead of "a monthly periodic payment," but that "[e]ach employee w[ould] be notified as to the actual form of payment allowable for their benefits." *Id.* at 3.

In June of 2000, Rich Novak ("Novak"), who is CCI's Vice President for Human Resources, Kurt Holland ("Holland") who is CCI's Manager of Employee Benefits, and John Tuomi ("Tuomi"), who was LTV's General Manager, met with the employees that had been identified as "key" employees, including the Plaintiff. The Plaintiff claims that, as a result of that meeting, he understood that, if he were to retire by June 30, 2000, then he would be entitled to an additional $400.00 per month, until he reached the age of 62, but that, if he elected, instead, to remain at LTV, he would be entitled to the benefits outlined in the Plan. The Defendant claims that Novak also explained to the key employees, that they would only become eligible for the Plan benefits if they continued to work at LTV until such time as CCI terminated their employment. In any event, the Plaintiff elected to remain at LTV.

Then, in November of 2000, CCI offered the Plaintiff a position at the Wabush Mines, in Sept–Iles, Canada. After visiting that location, the Plaintiff decided not to accept the offer due, in large part, to the fact that it would require him to relocate his home. Relying on his reading of the second subdivision, under the Plan's provisions which concerned an "Offer of Continued Employment with a 'CCI Associated Employer,'" and which pertained to employees offered a position that required relocation to a location outside of Northern Minnesota,[3] the Plaintiff informed Robert J. LeRoux ("LeRoux"), who is CCI's Controller, that he was electing "voluntary termination with basic and special retention benefits" which, he believed, entitled him to ten month's full pay, and a $400.00 per month pension add-on.[4] LeRoux informed the Plaintiff that he was not entitled to those benefits, because his employment had not been terminated by CCI but,

---

**3.** The parties agree that the Sept–Iles Canada location of the Wabush Mines is "outside of Northeastern Minnesota," and thus falls under this second provision.

**4.** We are unsure of where the ten month figure came from, as our reading of the Plan reveals that the severance pay was only six month's pay.

instead, had resulted from the Plaintiff's own election.

Thereafter, the Plaintiff sent an electronic message to John Brinzo ("Brinzo"), who is the Chief Executive Officer of CCI, asking whether Brinzo agreed with LeRoux's position. Brinzo replied that he did, and explained to the Plaintiff that, if the Plaintiff had elected to terminate his own employment, he was not covered by the Plan. Thomas O'Neil, who was the President and Chief Operating Officer of CCI, also concurred in that interpretation. Faced with those opinions, the Plaintiff elected to continue working for CCI, and he remained at LTV until April 30, 2001,[5] at which time he voluntarily retired from CCI, and moved to Denver, Colorado, where he commenced a new job.

 The Plaintiff initially brought this suit in the St. Louis County District Court for the Sixth Judicial District of the State of Minnesota, as a State law contract action, claiming that the Defendant had wrongfully refused to pay him the benefits to which he was entitled under the Plan. Thereafter, the Defendant removed the action to this Court, under our diversity jurisdiction, see *Title 28 U.S.C. § 1332*, and also on the ground that, because the Plan was governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), the Plaintiff's State law contract claims were preempted.[6]

In the Motions before us, the Defendant seeks Summary Judgment on the grounds that the Plaintiff's State law contract action is preempted by ERISA. Alternatively, the Defendant argues that, even if the Plaintiff's claims were not preempted, it is, nonetheless, entitled to Summary Judgment because it complied with the plain meaning of the Plan's terms, when it denied the Plaintiff's claim for benefits. The Plaintiff disputes the Defendant's assertion that the Plan is governed by ERISA, and argues that he is entitled to Summary Judgment because, as a matter of law, the Defendant wrongfully denied him benefits under the Plan. The Plaintiff has also moved for a Trial by Jury.

### III. *Discussion*

Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, *Duffy v. McPhillips*, 276 F.3d 988, 991(8th Cir.2002); *Schoolhouse Inc. v. Anderson*, 275 F.3d 726, 728 (8th Cir.2002); *Krentz v. Robertson Fire Protection Dist.*, 228 F.3d 897, 901 (8th Cir. 2000); *Curry v. Crist*, 226 F.3d 974, 977 (8th Cir.2000); *Carter v. St. Louis Univ.*,

---

**5.** The Plaintiff's last day of work at LTV was actually sometime in late March of 2001, but due to accrued vacation time, he continued to be employed by CCI until April 30, 2001.

**6.** Even in the absence of diversity jurisdiction, the Defendant could still have properly removed this case as presenting a Federal question. Generally, the "well-pleaded Complaint" rule bars the removal of an action filed in State Court, where the Federal question does not appear in the Complaint, but only in a defense to its allegations. See, e.g., *Petersen v. E.F. Johnson Co.*, 2002 WL 1975907 (D.Minn. Aug. 23, 2002). However, an exception to that rule "exists for certain types of federal regulations that completely preempt state laws," including ERISA. *Id.*, citing *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 66, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). "Thus, ERISA can be the basis for federal jurisdiction even when preemption is raised only in defense." *Id.*

167 F.3d 398, 400 (8th Cir.1999). For these purposes, a disputed fact is "material," if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine," if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Herring v. Canada Life Assurance*, 207 F.3d 1026, 1028 (8th Cir.2000); *Austin v. Minnesota Mining and Manuf. Co.*, 193 F.3d 992, 995 (8th Cir.1999); *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir.1998); *Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir.1998).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine ·dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure;* see also, *Anderson v. Liberty Lobby, Inc.*, supra at 256, 106 S.Ct. 2505; *Allen v. Entergy Corp.*, 181 F.3d 902, 904 (8th Cir.1999); *Jaurequi v. Carter Manufacturing Co.*, 173 F.3d 1076, 1085 (8th Cir.1999). Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, supra at 322, 106 S.Ct. 2548; see also, *Hammond v. Northland Counseling Center*, Inc., 218 F.3d 886, 891 (8th Cir.2000); *Greer v. Shoop*, 141 F.3d 824, 826 (8th Cir.1998). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, supra at 323, 106 S.Ct. 2548; see also, *Bell Lumber and Pole Co. v. United States Fire Ins. Co.*, 60 F.3d 437, 441 (8th Cir.1995); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross*, 992 F.2d 162, 163 (8th Cir.1993).

As we have noted, the Defendant urges that the Plaintiff's State law contract claim is preempted by Federal law. Therefore, although we "give the benefit of all factual inferences to the plaintiff, a finding by the court that the plaintiff's claims are preempted by federal law would entitle the defendant to" Summary Judgment. *Murphy v. SmithKline Beecham Animal Health Group*, 898 F.Supp. 811, 813–14 (D.Kan.1995). Accordingly, our analysis necessarily starts with that threshold argument, and we find the preemption of State law that the Defendant urges.

In support of its Motion for Summary Judgment, the Defendant asserts that its Plan falls squarely within the preemptive scope of ERISA. The Plaintiff disagrees, and contends that the Defendant has failed to present any evidence to show that it established or, in fact, even contemplated the establishment of an ERISA plan, and that, in any event, the Plan did not qualify as an ERISA employee benefit plan.

■ A. *Standard of Review.* When enacting ERISA, Congress included a preemption provision to "ensure[ ] that the administrative practices of a benefit plan w[ould] be governed by only a single set of regulations." *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), citing *H.R.Rep. No. 93–533*, p. 12 (1973). The enactment of that "provision was prompted by [the] recognition that employers establishing and maintaining employee benefit plans are faced with the task of coordinating administrative activities," and that a "[a]

patchwork scheme of regulation[s] would introduce considerable inefficiencies in benefit program operation, which," in turn, might lead employers to elect not to offer benefits, or to discontinue established benefit plans. *Id.* However, ERISA's preemptive effect only applies to qualifying benefit plans. See, *Kulinski v. Medtronic Bio–Medicus, Inc.,* 21 F.3d 254, 257 (8th Cir.1994).

 "An employer's decision to extend benefits does not constitute, in and of itself, the establishment of an ERISA plan." *Id.,* citing *Wells v. General Motors Corp.,* 881 F.2d 166, 176 (5th Cir.1989). In order to determine whether a particular employee benefit plan falls within ERISA's ambit, a reviewing Court's "pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits." *Id.* If such a scheme is necessary, then an employee benefit plan falls within the preemptive scope of ERISA. In *Crews v. General American Life Insurance Co.,* 274 F.3d 502, 505 (8th Cir.2001), the Court of Appeals for the Eighth Circuit enumerated the factors that a Court should consider in reaching that determination, and explained as follows:

> When determining whether payments require an ongoing administrative scheme, we consider whether the payments are one-time lump sum payments or continuous payments, whether the employer undertook any long-term obligation with respect to the payments, whether the severance payments come due upon the occurrence of a single, unique event or any time that the employer terminates employees, and whether the severance arrangement under review requires the employer to engage in a case-by-case review of employees.

*Id.,* citing, *Emmenegger v. Bull Moose Tube Co.,* 197 F.3d 929, 934–35 (8th Cir.

1999), *Kulinski v. Medtronic Bio–Medicus,* supra at 256–58.

Under this analysis, "[t]he last factor is frequently determinative." *Gilmore v. Silgan Plastics Corp.,* 917 F.Supp. 685, 688 (E.D.Mo.1996).

**B.** *Legal Analysis.* The Plaintiff has advanced two arguments against the Defendant's urging that his State law based claim is preempted by ERISA. First, the Plaintiff contends that "there is no evidence that [the] Defendant established or contemplated a plan pursuant to ERISA," because the Defendant has not satisfied the "numerous reporting provisions and fiduciary requirements" required by ERISA. *Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment,* at 10. Second, the Plaintiff argues that the Plan did not fall under ERISA, because payments of benefits under the Plan did not require an ongoing administrative scheme. We address each argument in turn.

**1.** *Whether the Plan Was an Employee Benefit Plan as Defined by ERISA.*

 According to the Plaintiff, ERISA requires employers to provide those employees, who are eligible for benefits under a plan, a "summary plan description," as well as other information, and to file that plan with the Secretary of Labor. *Id.* at 10, citing *Title 29 U.S.C. § 1021(a)-(b).* The Plaintiff maintains that there is "no evidence that [the] Defendant provided [him] with a summary of the plan," "apprised [him] of his rights and obligations under the plan," or ever filed the Plan with the Secretary of Labor. Thus, the Plaintiff maintains that the Plan cannot be an employee benefit plan as defined by ERISA.

A similar argument was raised by the plaintiff, in *Petersen v. E.F. Johnson Co.,* 2002 WL 1975907 at *3, (D.Minn., Aug. 23,

2002), where he contended that an employee benefit plan was not governed by ERISA, because the plan's administrators had "failed to comply with the reporting and disclosure requirements of ERISA." The Court disagreed, and explained that "th[o]se requirements do not determine whether ERISA applies," and were "relevant to whether the Program complie[d] with ERISA, not [to] whether ERISA applie[d] to the Program." *Id.* In reaching that decision, the Court relied upon *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982) (adopted by the Eighth Circuit in *Harris v. Arkansas Book Co.,* 794 F.2d 358, 360 (8th Cir.1986)); see also *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 104, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (treating termination payment plan as an ERISA plan, even though the employer, who had been unaware that ERISA applied to that plan, had not set up a claims procedure, or complied with ERISA's reporting, and disclosure requirements).

In *Donovan,* the Court of Appeals for the Eleventh Circuit was faced with the question of whether a group insurance trust program was an "employee benefit plan," under ERISA. That Court noted that, in addition to providing a standardized regulatory system for employers who offered benefit programs to their employees, ERISA was also designed "to protect working men and women from abuses in the administration and investment of private retirement plans and employee welfare plans." *Id.* at 1370. Therefore, "[w]ith few exceptions * * * ERISA applies to any" "(1) * * * 'plan, fund or program' (2) established or maintained (3) by an employer * * * (4) for the purpose of providing * * * benefits (5) to participants or their beneficiaries." *Id.* at 1371.

In *Donovan,* as here, the question arose as to whether, when the employer had not complied with the writing, reporting, or disclosure requirements of ERISA, a plan could, nevertheless, fall within ERISA's coverage. The Court construed that argument as asserting that the "established or maintained" element of the above-recited test had not been met. The Court explained that "ERISA's coverage provision reaches 'any employee benefit plan if it is established or maintained' " by an employer "engaged in any activities or industry affecting commerce." *Id.* at 1372. The Court held that it was only after it was determined that a plan was covered by ERISA, that "the Act's fiduciary and reporting provisions * * * require[d] the plan to be established pursuant to a written instrument." *Id.* Accordingly, the Court found that those reporting requirements were not, in and of themselves "prerequisites to coverage under the Act." *Id.*

However, the Court explained that the mere decision, by an employer, to offer benefits of the type that might be covered by ERISA did not mean that any plan, which is later developed by that employer, would be governed by ERISA. Instead, the Court held that a plan is "established" under ERISA "if from the surrounding circumstances a reasonable person c[ould] ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Id.* at 1373.

The plan before the Court, in *Petersen,* satisfied the *Donovan* test. There, although the source of financing was not expressly stated in the Plan, the Court found that a person could reasonably identify that the funding source of any benefits was "the same as the source of the participant's salary and medical benefits before termination: the company's general assets." *Id.* at *2. Likewise, the Court held that, notwithstanding the fact that the plan did not outline the procedures an employee had to follow to receive benefits, a reason-

able person would know who to approach to discover that information. Thus, as a reasonable person could ascertain all of the required information from the plan, the plan was "established" and the employer's "fail[ure] to comply with the reporting and disclosure requirements of ERISA," did not take the plan outside of ERISA's preemptive scope. *Id.* at *3.

The application of the *Donovan* factors to this case, results in the same conclusion. A reasonable person could ascertain the intended benefits, and beneficiaries, of the Plan, as they were expressly outlined in its provisions. In addition, a reasonable person could also identify the source of those benefits, as there is no evidence to suggest that it was other than "the same as the source of the participant's salary and medical benefits before termination: the company's general assets." *Petersen v. E.F. Johnson Co.,* supra at *2. Likewise, as was the case in *Petersen,* even though the Plan did not explicitly contain the procedures an employee must follow to obtain benefits, a reasonable person could ascertain who to approach to ascertain that procedures. The employees who might be eligible for benefits under the Plan were spoken to, about its benefits, by CCI's Vice President for Human Resources, and Manager of Employee Benefits, as well as LTV's General Manager—any of whom the employee could reasonably approach to determine what process he, or she, had to pursue to claim benefits.

Thus, we conclude that the Plan was "established," despite the Defendant's failure to comply with ERISA's registration requirements, and we conclude that the Plan was an "employee benefit plan" as defined under ERISA. *Id.* at 1371. Accordingly, we proceed to a consideration of whether the payment of benefits under the Plan required an on-going administrative scheme.

2. *Whether the Plan Requires an On-Going Administrative Scheme.*

██ As we have previously related, in determining whether a plan requires an on-going administrative scheme, we must consider four factors: whether the payments under the plan are one-time lump sum, or continuous, payments; whether the employer undertook any long-term obligation with respect to the payments; whether the severance payments come due upon the occurrence of a single, unique event, or any time that the employer terminates employees; and whether the plan requires the employer to engage in a case-by-case review of the employees. The Plaintiff maintains that the Plan did not satisfy those requirements. As urged by the Plaintiff, the Plan was created to deal with a single event—the closing of LTV— and, upon an employee's termination, his or her basic and special retention benefits were paid in a one-time lump sum payment, such that the Defendant did not undertake any long-term obligations with regard to those benefits. In addition, the Plaintiff claims that administration of the Plan did not require a case-by-case review of each employee. We disagree.

██ While the Plan was certainly created to deal with the closing of LTV, we conclude that the closing was not a single, one-time event, of the type that excludes an employee benefit plan from ERISA's protections. The question we are obligated to ask is not simply whether the plan was created in response to a particular event, but rather, "whether the severance payments come due upon the occurrence of a single, unique event or any time that the employer terminates employees." *Crews v. General American Life Ins. Co.,* supra at 506 [emphasis added].

We think that the distinction is made clear by a consideration of the reasoning, which was employed by the United States

Supreme Court in *Fort Halifax Packaging Company, Inc. v. Coyne*, supra. There, the issue was whether a State statute, which required all employers to provide a one-time severance payment to employees in the event of a plant closing, was preempted by ERISA. In concluding that ERISA did not apply to that statute, the Supreme Court reasoned as follows:

> The Maine statute neither establishes, nor requires an employer to maintain an employee benefit **plan**. The requirement of a one-time lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well **never** have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

*Id.* [emphasis in original, footnote omitted].

Here the Plan, even though developed in response to LTV's closure, required more than a "single set of payments to employees" at one time. Here, severance payments would come due "any time that the employer terminates" one of the employees that remained at LTV after June 30, 2000. *Crews v. General American Life Ins. Co.*, supra at 506. Since these employees "might be terminated singly or in groups of indeterminate size," "at any time," "for as long as [the Defendant] ha[d] employees" at LTV, "[t]he severance plan as written contemplates a continuing, albeit possibly sporadic, need for processing requests for benefits and making payments." *Emmenegger v. Bull Moose Tube Co.*, supra at 935. As a result, we find that the Plan, here, was not developed, as the Plaintiff asserts, in response to a single, unique event, of the type that would take the Plan outside of ERISA's coverage.

Likewise, we are unable to agree with the Plaintiff's assertion that the benefits, which were paid under the Plan, were made in a one-time, lump sum payment. In *Fort Halifax*, the statute at issue provided that, upon the plant's closure, the employer was to make a single, specified, payment to each employee. However, here, while it is true that each employee would receive a lump sum payment, of six month's salary, as a severance payment, the Supplemental benefit plans might be paid on a monthly basis, over a series of years.[7] Those provisions clearly provide for a long-term obligation on the Defendant's part. For example, an employee might be eligible for the 70/80 Supplement at age 55, which would entitle him or her to seven years of monthly supplement payments. A seven-year obligation to make such payments is clearly a long-term obligation. See, *Fort v. St. Paul Fire and Marine Ins. Co.*, 2002 WL 1127657, at *4 (D.Minn. May 28, 2002)(payment of benefits "over the span of 46 weeks required [the employer] to undertake the long-term

---

7. We say "might" because, as we previously related, the Plan did provide that IRS Pension Plan Rules could cause "the actual payment(s) [to] be in the form of a lump sum present value rather than a monthly payment." *Plan*, at 3.

obligation of making its payments * * * throughout that time period."). The fact that the Defendant has obligated itself to making years of monthly payments to each employee, each of whom might be terminated at a different time, with a differing number of remaining months of eligibility, clearly demonstrates that the Plan did not provide for a single, lump-sum payment to each beneficiary, and that the Defendant had undertaken a long-term obligation to those beneficiaries.

Further, under the Rule of 65 Supplement, the $400.00 monthly supplement was subject to a reduction of $1.00 for every $2.00 of income over $17,000, that was earned in a single calendar year. As a consequence, the Defendant would be obligated to keep itself apprised of any income, which was earned by an employee who was entitled to benefits under this provision, for the duration of the period during which he, or she, was entitled to supplemental benefits. Likewise, if the terminated employee was re-employed by a CCI employer, such employment would "mitigate" the payment of severance benefits, which would obligate the Defendant "to monitor the [terminated employee's] employment status throughout the time period of entitlement to installment payments." *Id.* Those considerations also demonstrate that long-term obligations had been undertaken by the Defendant.

Since each employee would become eligible for benefits, under the Plan, upon his or her own termination, and not at some shared point in time, and since the Plan expressly provided for monthly payments over a number of years after that termi-

nation, with the amount of those monthly benefits being subject to change over time, we conclude that the first three elements of the *Crews* test weigh heavily in favor of a finding that the Plan was an ERISA plan.[8]

■ However, the Plaintiff has also argued that the Plan did not require a case-by-case review of the employees, for eligibility, because the only determinations, that had to be made under the Plan, were mechanical determinations, which did not require the exercise of any discretion. As we have related, this last factor is "frequently determinative" of whether an employee benefit plan falls within ERISA's scope. *Gilmore v. Silgan Plastics Corp.,* supra at 688. Not surprisingly, therefore, the Defendant disagrees, and maintains that the Plan required a case-by-case review of each employee for eligibility purposes.

■ "Where severance payments are not 'virtually automatic,' * * * decisions regarding eligibility for severance benefits and the amount of such benefits are made with the exercise of judgment." *Fort v. St. Paul Fire and Marine Ins. Co., supra* at *5. The Defendant urges that the administration of its Plan required it to make several, distinct, determinations, which necessitated a case-by-case review of each terminated employee. According to the Defendant, the first of those determinations was the initial decision as to which employees it wanted to retain past June 30, 2000—which, in turn, was a decision as to which employees it wanted to be eligible

---

8. In part, we view that the Plaintiff's error, in asserting that the Plan provided only for a lump-sum payment that did not require any on-going involvement by the Defendant, as arising from his focusing, too heavily, on how the Plan applied to him. It may be true that, if the Plaintiff was otherwise qualified for supplemental benefits under the 70/80 Sup-

plement at the time of his termination, he would have been entitled to the six months of severance pay, and a specific number of $400.00 per month supplemental payments, that would have been paid to him in a lump sum. But our task requires a consideration of the Plan as a whole, and not just the Plan's purported application to the Plaintiff.

for the Plan's benefits. The Defendant asserts that the second determination, which was required by the Plan, was when to terminate the employee, so as to make the employee eligible for those benefits. We agree, however, with the Plaintiff, that those types of eligibility decisions are inapposite to a determination as to whether the Plan falls under ERISA.

The Court, in *Gilmore v. Silgan Plastics Corp.* 917 F.Supp. 685, 689 (E.D.Mo.1996), confronted a similar argument. There, upon the announcement that the defendant plant was closing, the defendant developed a severance package which would be granted to resigning employees, who received the Plant Manager's agreement as to their resignation. The Court found that, "[a]lthough the defendant ha[d] phrased its 'severance policy' in terms of eligibility criteria, [the] defendant essentially used severance benefits selectively to entice certain employees to resign on the company's terms so that the company could fill its production needs." *Id.* at 687. Thus, the Court held that the only "discretion involved in [the] defendant's severance 'policy' was in deciding whether to offer severance benefits at all, rather than in deciding which employees would be eligible for the severance benefits," and that such an exercise of discretion, "did not render the severance benefits an ERISA plan." *Id.* We agree, for we find that the decisions, as to which employees to keep at LTV, and when, thereafter, to terminate those employees, were not the type of case-by-case determinations that would place a plan within ERISA's control.

However, we are unable to agree with the Plaintiff's view, that the Plan did not require anything of the Defendant, other than a mechanical determination that did not necessitate a case-by-case review. Once an employee was terminated, the Defendant had to determine whether that employee was entitled to any of the sup-

plemental benefits and, if so, which type. The Defendant also had to consider whether a generally equivalent position had been offered to that employee and, if so, whether that offer served to disqualify the employee from a benefit to which he, or she, was otherwise entitled. Accordingly, we agree with the Defendant that those determinations required a "case-by-case review of each employee's situation to determine whether the employee is both eligible for and qualifies for benefits." *Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment,* at 5.

After determining that an employee has been terminated, the Defendant was obligated to ascertain whether he or she had been offered another position that would disqualify the person from all, or some, of the benefits under the Plan. In *Kulinski v. Medtronic Bio–Medicus,* supra at 259, our Court of Appeals recited, with approval, the reasoning of the Court of Appeals for the Ninth Circuit in *Bogue v. Ampex Corp.,* 976 F.2d 1319, 1321 (9th Cir.1992). There, an employer had established a plan which promised to pay severance benefits to executives who were not offered "substantially equivalent employment" upon the company's sale. Under that plan, "substantially equivalent employment" was defined as employment where the responsibilities were similar in the new position to those in the old position. The Ninth Circuit Court of Appeals found that those criteria had to be applied on a case-by-case basis and that, as such, the program "required the sort of discretionary decision-making by the plan's administrator that is the hallmark of an ERISA plan," and could not be managed without an on-going administrative scheme. *Bogue v. Ampex Corp.,* supra at 1321.

Likewise, the Defendant here would, on occasion, have to make a determination as

to whether an employee had been offered a "generally equivalent position," which provided the same base pay, and incentive programs, as the position from which he or she had been terminated. *Plan*, at 2. Accordingly, the Defendant had to do more than simply "write a check," each time an employee was terminated, since the Plan required it to undertake a case-by-case analysis of each employee. While in many instances, that analysis could be brief—since a finding that no position had been offered, or that the offered position was exactly the same as the one from which the employee was terminated, would preclude the need for any further determination—the Plan still required that the Defendant consider each terminated employee, on a case-by-case basis, even if that consideration could be performed with dispatch.

Although we agree with the Plaintiff, that the payment of severance payments, and the determination of which supplemental benefits a person was entitled to receive, are the type of mechanical decisions that would not require a case-by-case review, after considering the Plan as a whole, we conclude that a case-by-case review was required in order to administer the Plan. Consequently, as we have found the Plan to be an employee benefit plan, that requires an on-going administrative scheme for the payment of benefits, we conclude that the Plan falls under ERISA. Therefore, ERISA's preemptive provisions apply, and the Plaintiff's State lawbased contract claim is wholly preempted.

Our analysis does not end here, however, for, at the time of the Hearing, the Plaintiff made an oral, informal Motion, to be allowed to amend his Complaint, so as to assert an ERISA claim, if we were to conclude that his State law claims were preempted by ERISA. The Defendant objected to this Motion, and argued that the time for any such amendment had long-passed, as the Plaintiff had been placed on notice, at the time that the Defendant had removed the action to this Court, of its contention that ERISA preempted the Plaintiff's only pleaded State law claims.

Of course, once a deadline for filing a Motion to Amend a Complaint has passed, a party seeking leave to do so must satisfy the requirements of Rule 16(b), Federal Rules of Civil Procedure, which provides that a Scheduling Order "shall not be modified except upon a showing of good cause and by leave of the district court judge or, when authorized by local rule, by a magistrate judge." *Scheidecker v. Arvig Enterprises, Inc.*, 193 F.R.D. 630, 631 (D.Minn. 2000), quoting *Archer Daniels Midland v. Aon Risk Services Inc.*, 187 F.R.D. 578, 581–82 (D.Minn.1999). Rule 16(b) imposes an exacting standard, under which a party must demonstrate that, despite the moving party's due diligence, it could not meet the deadline imposed by the Pretrial Order. *Rule 16(b), Federal Rules of Civil Procedure, Advisory Committee Notes—1983 Amendment;* see also *Julian v. Equifax Check Services, Inc.*, 178 F.R.D. 10, 16 (D.Conn.1998). "[C]arelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir.1992).

■ Here, the Plaintiff has been aware, since the removal of this action to Federal Court, that the Defendant was contending that the Plan fell under ERISA, thereby preempting the Plaintiff's claims as alleged in his Complaint. Yet, the Plaintiff offers no cogent reason why he did not, or could not have, amended his Complaint, so as to allege an ERISA claim, as an alternative cause of action, on a timely basis. As our Court of Appeals recently observed, in *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir.2001):

It is true that the Federal Rules are usually liberally construed to permit parties to amend pleadings, add additional parties and to similarly control the pace of litigation. See, e.g., *Hopkins v. Saunders*, 199 F.3d 968, 974 (8th Cir. 1999), cert. denied, 531 U.S. 873, 121 S.Ct. 176, 148 L.Ed.2d 121 (2000); *Gray v. Bicknell*, 86 F.3d 1472, 1481 (8th Cir. 1996). As regards case management orders, however, the Federal Rules set a less forgiving standard. Federal Rule of Civil Procedure 16(b) specifies that such an order "shall not be modified except upon a showing of good cause and by leave of the district judge." Thus, a moving party must first make the requisite showing. Even then the district court retains discretion as to whether to grant the motion. As a vehicle designed to streamline the flow of litigation through our crowded dockets, we do not take case management orders lightly, and will enforce them. *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir.1999), cert. denied sub nom. *Rainy Lake One Stop, Inc. v. Marigold Foods, Inc.*, 529 U.S. 1038, 120 S.Ct. 1534, 146 L.Ed.2d 348 (2000).

\* \* \* \* \* \*

The primary measure of Rule 16's "good cause" standard is the moving party's diligence in attempting to meet the case management order's requirements. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir.1992). "[T]he existence or degree of prejudice to the party opposing the modification" and other factors may also affect the decision. *Id.* In this case, however, we have no need to explore beyond the first criterion because the record clearly demonstrates that [plaintiff] made only minimal efforts to satisfy the CMS's [i.e., Case Management Order's] requirements.

Here, the Plaintiff offers no showing of due diligence and, therefore, his Motion to Amend is denied on timeliness grounds. However, even if the Motion were timely, we would be compelled, nonetheless, to deny his Motion as futile, as the Defendant properly denied the Plaintiff's request for benefits under the Plan. See, *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ("In the absence of any apparent or declared reasons—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.— the leave should, as the rules require, be 'freely given.' ").

 "ERISA provides a plan beneficiary with the right to judicial review of a benefits determination." *Delta Family–Care Disability and Survivorship Plan v. Marshall*, 258 F.3d 834, 840 (8th Cir.2001). In conducting such a review, a Court is to "review an ERISA plan's denial of benefits based on plan interpretation de novo unless the plan gives the administrator or fiduciary discretionary authority to determine participants' eligibility for benefits or to construe the plan's terms." *Meyer v. Duluth Building Trades Welfare Fund*, 299 F.3d 686, 689 (8th Cir.2002); citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Milone v. Exclusive Healthcare, Inc.*, 244 F.3d 615, 618 (8th Cir.2001); *Wallace v. Firestone Tire & Rubber Co.*, 882 F.2d 1327, 1329 (8th Cir.1989).

 "In other words, unless the plan language specifies otherwise, courts should construe any disputed language 'without deferring to either party's interpretation." *Wallace v. Firestone Tire & Rubber Co.*, supra at 1329, citing *Firestone Tire & Rubber Co. v. Bruch*, supra at 112,

109 S.Ct. 948. If the plan does provide for such discretionary authority, then the benefits denial is reviewed for abuse of discretion. *Id.*, citing *Milone v. Exclusive Healthcare, Inc.*, supra at 618. Here, the parties have not addressed the issue of whether the Plan did, or did not, provide the Defendant with discretionary authority to determine benefit eligibility, but we have found no language in the Plan that expressly provides such discretion. Therefore, our review of the Defendant's interpretation of the challenged provision is de novo and, upon our close review, we find the Defendant's interpretation of the Plan to be proper.

■ The language at issue is contained in the second provision under the "Offer of Continued Employment with a 'CCI Associated Employer.'" As we have previously related, that provision provides as follows:

> If offered a position that is "not generally equivalent" and/or a position that requires relocation from primary residence, outside of Northeastern Minnesota, incumbent will have the option to: a) accept position with appropriate relocation assistance in lieu of basic severance pay and special retention benefits, or b) elect voluntary termination with basic and special retention benefits.

There is no dispute that the position offered to the Plaintiff at Wabush Mines, in Sept–Isles, was outside of Northeastern Minnesota. Thus, the Plaintiff claims that he was entitled to reject that job offer, elect voluntary termination, and retain all of the benefits under the Plan, and that, therefore, the Defendant was wrong to deny him those benefits.

The Defendant argues, however, that the Plaintiff's reading of the Plan ignores the eligibility requirement found in the Plan's first paragraph, which expressly states that "salaried employees at LTV Steel Mining Company will become eligible for the [Plan] benefits by continuing to *work until their employment is terminated.*" [Emphasis in original]. According to the Defendant, no employee becomes eligible for any benefit, until that person's employment was terminated by the Defendant. The Defendant maintains that such an interpretation makes sense given the context in which the Plan was established—that is, being a retention device, the Plan was intended to keep key employees at LTV, by providing them with incentives, in the form of the Plan's benefits, in order to induce their stay, at LTV, after the retirement deadline of June 30, 2000. The Defendant emphasizes that, if an employee could do as the Plaintiff suggests, and voluntarily terminate his or her position and still obtain the additional benefits provided under the Plan, then it would lose the benefit of the bargain that it had made to keep those employees at the plant, after LTV's closing. Thus, as urged by the Defendant, no employee could be eligible for the Plan's benefits until such time as that employee's employment, at LTV, was terminated by the Defendant. Here, all concede that the Plaintiff voluntarily left his position at LTV and, therefore, under the Defendant's construction of the Plan, he was ineligible for the Plan's benefits.

In response, the Plaintiff has questioned how a person could elect "voluntary termination" after he, or she, was already terminated. According to the Plaintiff, to afford meaning to all of the provisions of the Plan, the provisions must be read as he proposes. The Defendant counters by noting that the Plaintiff's reading ignores the key eligibility language, as recited at the beginning of the Plan's provisions, and that its own construction of the Plan is the only one under which each of the Plan's provisions is given substance, and internal consistency.

We agree with the Defendant that the Plan cannot be read as the Plaintiff has

suggested. First, and most foremost, is the eligibility language which is provided in the provisions of the Plan, and which makes plain—indeed, the language is underscored for emphasis—that a salaried LTV employee only becomes eligible for the Plan's benefits by continuing to work until their employment, at LTV, is terminated. The Plaintiff argues that the provision does not say that the employment must be terminated by the Defendant, and that, since "terminated" simply means "ended," an employee, as well as an employer, could end the employment relationship. We do not take strong exception to the definition of "terminated," as urged by the Plaintiff, if we were to consider the term generally, and without context. Here, however, two critical contextual issues confront us. First, is the common meaning of the word "terminate" when it is employed to describe the end of an employment relationship. In that context, the ordinary understanding of the word is to denote the act of an employer in ending the employment relationship with a given employee. Again, in the employment context, a "voluntary termination," denotes the act of the employee in terminating his employment relationship with the employer. In this instance, given the intent and purposes of the Plan, and in the context of LTV's closure, the Plan would have no beneficial purpose to the Defendant, if an employee could quit, and still obtain the Plan's benefits. While the Plaintiff may regard his willingness to continue employment at LTV, until he decided to quit, as a

benefit to the Defendant, if his reading is correct, then any employee who elected to stay at LTV for one day, and then quit, would have the same right, as that claimed by the Plaintiff, to receive Plan benefits, thereby depriving the Defendant of the benefit of its bargain. To hold otherwise would be to alter the manifest purpose of the Plan.

In so construing the Plan, we have not overlooked the Plaintiff's query as to how an employee, whose employment had already been terminated, could ever "voluntarily terminate" his employment relationship. We see little but semantics in the query.[9] Plainly, the Plaintiff retained an employment relationship with the Defendant until he voluntarily elected to resign from that relationship. He did not leave his employment by edict of the Defendant—that is, he was not terminated—he chose to work with a different employer at a time that suited him, and not the Defendant. Had he continued to work with the Defendant until his employment was no longer needed by the Defendant, then he would not have had to file this lawsuit, as all concede that, under such a circumstance, the Plaintiff would be entitled to benefits under the Plan.

Having read the Plan as an integrated whole, giving meaning to all of its provisions so as to render none superfluous, or nugatory, we conclude that the Defendant's interpretation of the Plan is proper, under de novo review, and provides the Plan with a logical meaning.[10] This read-

9. While the Plaintiff is dubious that one can be "terminated," after he has been advised that his employment will not be further needed because of his plant's closure, we find the argument to be more abstruse than substantive. An employee can be informed that his employment will be terminated effective on some later date. If, prior to that later date, continued employment is offered, and rejected, or is accepted, and then the employee resigns, a termination is effected, either as

compelled by the employer, or as voluntarily elected by the employee.

10. Notably, the Plaintiff does not offer any evidence, parole or otherwise, beyond his reading of the Plan, to suggest that the Defendant misinterpreted the Plan's provisions. In fact, quite to the contrary, the Plaintiff has raised, as his sole argument in support of his Motion for Summary Judgment, the assertion that the Plan is unambiguous, and that, under

ing gives effect to the purpose of the Plan in providing incentives for key employees to be retained, even after LTV's closure, and at a time when both the Defendant, and the retained employee, are aware that the employment relationship will not long continue absent the Defendant's offer of further employment at one of its affiliate facilities. If the offered position is a non-equivalent .position, or is one requiring a relocation, then the retained employee has two choices: 1) take the job and become ineligible for the Plan benefits; or 2) decline the job offer, and elect to be terminated. Here, the Plaintiff refused a job offer, returned to work with the Defendant for a period of time, and then, on his own, elected to terminate his relationship with the Defendant in order to accept employment with a different employer.

The construction urged by the Plaintiff, ignores, or renders meaningless, the eligibility language contained in the first paragraph of the Plan. More importantly, the Plaintiff's reading of the Plan would destroy its essential purpose by rewarding a key employee with Plan benefits, even if that employee worked only one additional day, after the closing of LTV, with little or no benefit to the Defendant. Although the Plaintiff appears to argue that the one additional day constitutes such a benefit, he was remunerated with wages for that additional day. The purpose of the Plan was to reward those who remained, after the LTV closure, until such time as the

Defendant no longer needed that employee's service. Accordingly, we deny the Plaintiff's informal Motion for leave to amend his Complaint as untimely but, even if we reached the issue, we would find the Motion to be futile.[11]

NOW, THEREFORE It is—

ORDERED:

1. That the Defendant's Motion for Summary Judgment [Docket No. 27] is GRANTED.

2. That the Plaintiff's Motion for Summary Judgment [Docket No. 21] is DENIED.

3. That the Plaintiff's Informal Motion for Leave to Amend his Complaint is DENIED.

4. That the Plaintiff's Motion for Jury Trial [Docket No. 20] is DENIED, as moot.

5. That the Clerk of Court is directed to enter Judgment in favor of the Defendant.

its plain terms, as he reads them, he is entitled to benefits. See, *Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment,* at 5–9. Notably, in his deposition testimony, the Plaintiff admitted that, prior to the day that he first asked for benefits under the Plan, he had not spoken with anyone at the Defendant company, "about their interpretation of the meaning of the provisions in" the Plan. See, *Deposition of Leonard Rosati, attached as Exhibit to Affidavit of W. Eric Baisden,* at 447–48. When he was afforded, by LeRoux, with the Defendant's interpreta-

tion of the Plan, he continued to work for the Defendant for another four months until he chose to end his employment with the Defendant. Accordingly, the Plaintiff has not so much as suggested that anything supports his interpretation of the Plan other than his own reading.

11. Having reached this decision, and the decision that the Plaintiff's State law claims are preempted by ERISA, we need not, consider the merits of the Plaintiff's Motion for a Jury Trial, which we deny here, as moot.