**GOSS INTERNATIONAL CORPO-RATION, a Delaware corporation, Plaintiff,**

v.

**TOKYO KIKAI SEISAKUSHO, LTD, a Japanese corporation; and TKS (U.S.A.), Inc., a Delaware corporation; Defendants.**

**No. C00–35–LRR.**

United States District Court,
N.D. Iowa,
Central Division.
Cedar Rapids Division.

May 26, 2004.

Bradley P. Nelson, Ian H. Fisher, Jose A. Lopez, Mary Beth Wynn–Smith, Steven

A. Weiss, William G. Schopf, Schopf & Weiss, Chicago, IL, Patrick M. Roby, Robert M. Hogg, Elderkin Law Firm, Cedar Rapids, IA, for Plaintiff.

Barry J. Reingold, Perkins Coie, LLP, Lawrence R. Walders, Neil R. Ellis, Sidley Austin Brown & Wood, LLP, Washington, DC, Hoken S. Seki, Hoken S. Seki Law Offices, Lake Forest, IL, Nicholas (Tre) Critelli, III, Nicholas V. Critelli, Jr., Nicholas Critelli Assoc, Des Moines, IA, Peter J. Toren, Sidley Austin Brown & Wood, LLP, New York, NY, for Defendants.

**ORDER REGARDING DEFENDANTS'
MOTION FOR A NEW TRIAL AND
MOTION FOR JUDGMENT AS A
MATTER OF LAW**

READE, District Judge.

**TABLE OF CONTENTS**

I. BACKGROUND ................................................... 1042

II. DISCUSSION ..................................................... 1043
 A. Motion for a New Trial ............................................ 1043
 1. Standard of Review ............................................ 1043
 2. Analysis ...................................................... 1044
 a. Whether the evidence supported the jury verdict .................. 1044
 i. Dallas Morning News sale .................................... 1044
 ii. Orlando Sentinel sale ....................................... 1046
 iii. Newark Star Ledger sale ................................... 1047
 b. Whether the jury instructions properly apprised the jury of the issues and the applicable law ................................. 1047
 i. Product comparability ....................................... 1048
 ii. Price comparison ........................................... 1048
 iii. Definition of "intent" ..................................... 1049
 iv. Lost sales and price suppression damages ..................... 1049
 c. Whether the court committed legal errors ....................... 1050
 i. Whether the court admitted improper evidence .................. 1050
 ii. Whether the court improperly excluded evidence ............... 1051
 B. Motion for Judgment as a Matter of Law ............................. 1052
 1. Standard of Review ............................................ 1052
 2. Analysis ...................................................... 1052
 a. Whether Goss met its burden of proof with regard to each element of its claim ........................................ 1052
 i. Evidence that TKS commonly and systematically sold newspaper press printing units within the United States at prices substantially below the prices of comparable printing units in Japan ................................................ 1052
 ii. Evidence that TKS intended to injure or destroy an industry in the United States ..................................... 1053
 iii. Evidence that TKS injured Goss ............................. 1054
 b. Whether the evidence supports the jury's finding of injury ......... 1055

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1055

This matter is before the court on Defendants Tokyo Kikai Seisakusho, Ltd.'s and TKS (U.S.A.), Inc.'s (collectively "TKS") Motion for a New Trial (docket no. 417) and Motion for Judgment as a Matter of Law (docket no. 418). Following an eleven-day trial, the jury returned a verdict in favor of Plaintiff Goss International Corporation ("Goss") on its claims that TKS engaged in dumping in violation of the Antidumping Act of 1916, 15 U.S.C. § 72 (the "1916 Act"). Specifically, the jury found that TKS caused injury to Goss with respect to three sales: the Dallas Morning News (the "DMN") in 1996, the Orlando Sentinel (the "OS") in 1997, and the Newark Star Ledger (the "NSL") in 1997. The jury awarded damages to Goss totaling $10,539,949.

## I. BACKGROUND

Goss Graphic Systems, Inc., was a manufacturer and supplier of newspaper presses, newspaper press additions and other printing press systems for the newspaper, advertising and commercial printing and publishing markets. Goss is the successor to the business and assets of Goss Graphic Systems, Inc. Tokyo Kikai Seisakusho, Ltd., is a Japanese corporation with its principal place of business in Tokyo, Japan which manufactures newspaper presses and newspaper press additions and distributes such products in Japan, the United States and other countries through its subsidiaries. TKS (U.S.A.), Inc., is a Delaware corporation with its principal place of business in Richardson, Texas which imports, markets and sells in the United States newspaper presses and newspaper press additions manufactured by Tokyo Kikai Seisakusho, Ltd.

Goss initiated this lawsuit against TKS in May, 2000 alleging claims against TKS under the 1916 Act. The 1916 Act provides in pertinent part:

It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell or cause to be imported or sold such articles within the United States at a price substantially less than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets of the country of their production, or of other foreign countries to which they are commonly exported after adding to such market value or wholesale price, freight, duty and other charges and expenses necessarily incident to the importation and sale thereof in the United States: Provided, That such act or acts be done with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States or of restraining or monopolizing any part of the trade and commerce in such articles in the United States.

15 U.S.C. § 72. Goss alleged in its Complaint that "[f]or years [TKS] has offered and sold Newspaper Presses and Newspaper Press additions in the United States at prices substantially less than their actual market value in other countries, after adding freight, tariffs and other charges and expenses. [TKS has] undertaken this conduct—called 'dumping'—in a deliberate effort to destroy or injure the United States Newspaper Press Industry."

The case was tried to a jury beginning on November 17, 2003 and was submitted to the jury on December 3, 2003, after eleven days of trial.[1] The jury returned a

---

**1.** The court's research indicates that this action is the only case to proceed to trial under the 1916 Act.

verdict in favor of Goss on December 3, 2003. The jury awarded to Goss lost profits and the opportunity cost of capital relating to lost profits with regard to three sales: (1) the Dallas Morning News in 1996; (2) the Orlando Sentinel in 1997; and (3) the Newark Star Ledger in 1997. The jury allocated damages as follows:

| Dallas Morning News | Lost profits | $ 840,720 |
|---|---|---|
| Dallas Morning News | Opportunity cost of capital relating to lost profits | $ 551,770 |
| Orlando Sentinel | Lost profits | $1,060,420 |
| Orlando Sentinel | Opportunity cost of capital relating to lost profits | $ 637,366 |
| Newark Star Ledger | Lost profits | $4,844,019 |
| Newark Star Ledger | Opportunity cost of capital relating to lost profits | $2,605,654 |

TKS now moves for a new trial pursuant to Rule 59(a)(1) of the Federal Rules of Civil Procedure and for judgment as a matter of law pursuant to Federal Rules of Civil Procedure 50(a) and (b). Neither party expressly requested oral argument on TKS's Motion for a New Trial or Motion for Judgment as a Matter of Law and the court concludes that no further argument is required. Therefore, this matter is now fully submitted.

## II. DISCUSSION

### A. Motion for a New Trial

#### 1. Standard of Review

■ Federal Rule of Civil Procedure 59(a) provides that "in an action in which there has been a trial by jury," the court may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R.Civ.P. 59(a). The court may grant a new trial to all or any of the parties on all issues or on particular issues. *Id.* The authority to grant a new trial is within the discretion of the district court. *Gray v. Bicknell,* 86 F.3d 1472, 1480–81 (8th Cir. 1996). The district court's denial of a motion for new trial is reviewed for abuse of discretion. *Id.* at 1480–81.

■ The standard for granting a new trial is whether the verdict is against "the great weight of the evidence." *Butler v. French,* 83 F.3d 942, 944 (8th Cir.1996). Any other standard " 'would destroy the role of the jury as the principal trier of the facts, and would enable the trial judge to disregard the jury's verdict at will.' " *White v. Pence,* 961 F.2d 776, 780 (8th Cir.1992) (quoting *Fireman's Fund Ins. Co. v. Aalco Wrecking Co.,* 466 F.2d 179, 187 (8th Cir.1972)). In evaluating a motion for a new trial pursuant to Rule 59(a), the "key question is whether a new trial should have been granted to avoid a miscarriage of justice." *McKnight v. Johnson Controls, Inc.,* 36 F.3d 1396, 1400 (8th Cir.1994). A new trial is appropriate when the first trial, through a verdict against the weight of the evidence or legal errors at trial, resulted in a miscarriage of justice. *See White,* 961 F.2d at 780. A miscarriage of justice occurs when there is insufficient evidence to support the verdict. *Douglas County Bank & Trust Co. v. United Fin. Inc.,* 207 F.3d 473, 478 (8th Cir.2000).

■ An additional ground for granting a new trial is improper jury instructions which cause material prejudice. *See Fink v. Foley–Belsaw Co.,* 983 F.2d 111, 114 (8th Cir.1993). The district court is

afforded broad discretion to instruct the jury in the form and language it considers fair and adequate to present the substantive law. *Grogan v. Garner,* 806 F.2d 829, 836 (8th Cir.1986). A party is entitled to an instruction reflecting that party's theory of the case if the instruction is legally correct and there is evidence to support the instruction. *Bursch v. Beardsley & Piper,* 971 F.2d 108, 112 (8th Cir.1992). However, a party is not entitled to a specific formulation of an instruction. *United States v. Ribaste,* 905 F.2d 1140, 1143 (8th Cir.1990). Jury instructions, taken as a whole and viewed in light of the evidence and the applicable law, must fairly and adequately submit the issues in the case to the jury. *Jones v. Board of Police Comm'rs,* 844 F.2d 500, 504 (8th Cir.1988). A new trial is appropriate when the jury instructions result in harmful error. *Gray,* 86 F.3d at 1485. There is no harmful error if the instruction, in general, correctly instructs the jury, even if one portion is technically incorrect. *Westborough Mall, Inc. v. City of Cape Girardeau,* 794 F.2d 330, 335 (8th Cir.1986). " 'The test is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues.' " *Id.* (quoting *Houston v. Herring,* 562 F.2d 347, 349 (5th Cir.1977) (per curiam)).

### 2. Analysis

TKS contends a new trial is warranted because: (1) the jury verdict was against the weight of the evidence; (2) the court issued improper jury instructions; and (3) the court erred in admitting and excluding evidence. In response, Goss contends: (1) there was more than sufficient evidence supporting the jury's verdict; (2) this court already has considered and properly rejected TKS's arguments regarding the governing law; and (3) the court's instruc-

tions and evidentiary rulings were fully consistent with the court's prior rulings.

### a. Whether the evidence supported the jury verdict

### i. Dallas Morning News sale

TKS contends a new trial is warranted under Federal Rule of Civil Procedure 59(a) on the grounds that there was no evidence presented at trial that: (1) Goss submitted a bid for the 1996 DMN contract; (2) Goss knew about the 1996 dispute between TKS and the DMN; or (3) the DMN considered inviting Goss to submit a bid. TKS further contends it is undisputed that Goss's failure to win a sale in 1996 was not due to TKS's conduct, but rather due to the DMN's decision not to invite Goss to bid for such a sale. Goss counters by arguing that the evidence introduced at trial clearly established that TKS made the 1996 sale to the DMN only because TKS used a dumped price and TKS used a fraudulent price increase and secret $2.2 million rebate to prevent the DMN from buying the two additional towers from Goss.

The court's review of the record leads it to conclude that the jury's verdict is well supported by the evidence presented at trial. The jury heard testimony from Raymond Sims, Goss's expert witness, that the 1996 DMN price was 16% to 51% below the price TKS charged for comparable equipment in Japan. TKS's own lawyer, Mr. Saito, testified that the price TKS charged for the 1996 sale was a dumped price. From this evidence alone, it was reasonable for the jury to conclude that TKS's 1996 sale to the DMN was made at a dumped price.

Based on the evidence adduced at trial, the jury could have also reasonably found that but for TKS's dumping, Goss would have made the 1996 sale to the DMN. Goss and TKS were the two final bidders for the

1994 contract. To avoid dumping, TKS would have had to offer a non-dumped price of $9,014,690 for the two-tower option in the contract. (PX 680B). Goss's bid attributable to those two towers was $5,396,000. (PX 680B). Thus, in 1996 when the DMN was evaluating the purchase of the two towers, the DMN knew that it could buy those two towers from Goss for approximately $5,000,000. From this evidence, the jury could have reasonably determined that if TKS had offered the DMN a non-dumped price in 1996 of $9,014,690, the DMN would have turned to Goss for the equipment, knowing it could have purchased the equipment from Goss for a lower price of $5,000,000.

The jury also heard deposition testimony from TKS's director and head of overseas sales, Tadashi Morimoto, that unless TKS could sell the two towers at the dumped price, he was fearful that the DMN would turn to Goss to purchase the equipment. Additionally, on November 13, 1995, Jesse Strong sent via facsimile a memorandum to Mr. Morimoto expressing this same concern and stating that unless TKS found a way around the price issues, the DMN could "call Goss back into the negotiation in which case Goss, knowing our inability to cut prices, could quote their lower price Newsliner at whatever price it takes to get the order ... and that would be a major disaster for TKS." (PX 141). When asked about this document at trial, Michael Shafer, TKS (USA)'s National Sales Manager, did not dispute Mr. Strong's statements and stated "[t]hat's what it says." Mr. Shafer also testified that in late 1995 and early 1996, the DMN was "upset" with TKS. Mr. Shafer testified that TKS was "having some installation problems over there," that TKS was "taking too long to install some mechanical equipment, we were having some computer problems," and that TKS "had to put a lot of attention and resources" toward the DMN.

The jury further heard evidence at trial that TKS agreed to a fraudulent price increase and secret $2.2 million rebate to keep the DMN from purchasing the two towers from Goss in 1996. To make it appear to Goss that the 1996 sale was not dumped, TKS and the DMN agreed to increase the price on paper to $7.4 million. In exchange, TKS and the DMN agreed that TKS would secretly rebate $2.2 million to the DMN through a combination of $1 million in cash and a promise of $1.2 million in free digital ink pumps or credit to be delivered in the future.

The jury was also presented with evidence that TKS and its counsel engaged in a concerted effort to conceal the secret rebates. Mr. Saito warned that putting the rebate in writing would be "incriminating" and that it should therefore be a verbal or "handshake deal." (PX 200). Even though he recognized that the agreement for free digital ink pumps was a direct *quid pro quo* for the phantom price increase, Mr. Saito told TKS that "there should be no apparent linkage between DIPs' give-away and the towers' price," and urged TKS (USA) to falsify its business records, stating that "TKS U.S.A.'s business records should carefully reflect that the DIPs were transferred to DMN as an inducement for DMN's future purchase of presses from TKS." (PX 197). There was also evidence presented at trial that TKS and its counsel attempted to destroy documents to conceal the secret rebates. For example, in May 1996, TKS executives in Japan told Mr. Saito that they had issued a standing order to TKS (USA) employees that all documents related to the DMN matter "should be disposed of whenever possible." (PX 199). When TKS employees committed the secret rebate agreement with the DMN to a signed, written agreement, TKS executives Mr. Morimoto and Takehiro Fukuyama stated that "there should not be such a docu-

ment" and ordered that copies of the document "must be collected and destroyed." (PX 84, 86). Mr. Morimoto likewise instructed the DMN to destroy a memorandum documenting the secret rebate: "destroy this fax letter after you read it." (PX 154). Based on the evidence presented at trial, the jury could have reasonably concluded that Goss would have obtained the DMN sale but for TKS's illegal conduct. The court therefore finds that the jury's award regarding the DMN sale was supported by the evidence. Thus, the court denies TKS's motion for a new trial on the basis of the jury's verdict relating to the DMN sale.

### ii. Orlando Sentinel sale

TKS contends Goss presented insufficient evidence at trial which would support the jury's verdict with regard to price suppression damages relating to the Orlando Sentinel sale in 1997. Specifically, TKS contends the testimony of Henry Cobb, Goss's former National Sales Manager, is speculative with regard to price suppression damages related to the OS sale. TKS cites to Mr. Cobb's testimony that in setting Goss's price for the OS contract, he did not know what TKS's price was. In response, Goss argues that there was sufficient evidence for the jury to conclude that because of TKS's dumping, Goss lowered its prices to win the OS bid.

This court already has ruled that profit erosion damages are available under the 1916 Act. *See* November 17, 2003 Order Regarding Defendants' Motion in Limine Regarding Statute of Limitations and Goss's Profit Erosion Claims. TKS has not shown any reason for the court to depart from its earlier ruling. The court therefore declines to grant a new trial on the basis that price suppression damages are not available under the 1916 Act.

TKS argues that Mr. Cobb's testimony is speculative with regard to price suppres-

sion damages. Testimony from a person involved in making pricing decisions is not speculative and can support a jury's price suppression damages award. *See Rose Confections, Inc. v. Ambrosia Chocolate Co.*, 816 F.2d 381, 385–86 (8th Cir.1987) (finding that testimony from the company's president and a sales broker is "sufficient to allow a reasonable juror to find competitive injury."). In this case, Mr. Cobb is Goss's former National Sales Manager who was involved in making pricing decisions. Based on Mr. Cobb's personal knowledge and experience, the court holds that his testimony was not speculative with regard to price suppression damages.

The court further finds that Goss presented sufficient evidence at trial to support the jury's determination that Goss reduced its prices because of TKS's dumping. In particular, the testimony of Mr. Sims and Mr. Cobb supports the jury's determination that, as a result of TKS's dumping, Goss lowered its prices to win the OS contract. Mr. Sims, Goss's expert witness, testified that he analyzed the sales in which Goss and TKS competed head-to-head. Mr. Sims specifically reviewed the OS sale. Mr. Sims testified at trial that Goss's prices were lower than they would have been on the OS sale because TKS was offering dumped prices. This evidence alone could support the jury's verdict regarding price suppression damages relating to the OS sale.

The testimony of Mr. Cobb also supports the jury's verdict. Mr. Cobb testified at trial that during the 1990's, TKS was "targeting Goss's prices, and I believe that they were targeting us to be 10 percent less than Goss's prices at the time." Mr. Cobb also testified concerning Goss's need to reduce its prices to compete with TKS for the OS sale. Mr. Cobb testified that as a result of TKS's dumping, Goss lowered its prices to win the OS contract.

Mr. Cobb testified that he had a number of discussions with the OS about price. Mr. Cobb further testified that the OS's pressroom manager, Jim Catch, told him that Goss's price had to be in line with the price being offered by TKS. Mr. Catch also told Mr. Cobb that Goss "had to reduce [its] price." Mr. Cobb also testified that Goss normally would have made about $14 million in profit on this type of order. Instead, because of TKS's low pricing, Goss reduced its prices and realized a profit of only $900,000. In light of the evidence presented at trial, the court finds that the jury award relating to the OS sale was reasonable and not against the weight of the evidence. Hence, the court denies TKS's motion for a new trial premised on the jury's verdict relating to the OS sale.

### iii. Newark Star Ledger sale

TKS contends Goss presented insufficient evidence at trial which would support the jury's verdict with regard to the Newark Star Ledger sale in 1997. TKS points to Mr. Cobb's testimony that he had been told by the NSL's production manager, Andy Harteveld, only that Goss's competition for the bid was "well below twenty million dollars." In response, Goss argues that there was enough evidence for the jury to conclude that Goss reduced its price because of TKS's dumping.

Goss's expert witness Mr. Sims specifically reviewed the NSL sale. Mr. Sims testified at trial that Goss's prices were lower than they would have been on the NSL sale because TKS was offering dumped prices. This evidence alone could support the jury's verdict regarding price suppression damages relating to the NSL sale.

The jury also heard testimony from Mr. Cobb regarding the NSL sale. Mr. Cobb testified that Goss and TKS were the only two companies bidding for the NSL sale. Mr. Cobb also testified that he had conver-sations with Andy Harteveld, Vice President of Operations at the NSL, concerning the prices being offered by TKS and Goss. Mr. Cobb testified that Mr. Harteveld told him that TKS was "well below $20 million." Mr. Harteveld also told Mr. Cobb that Goss needed to get their price below TKS's price of $20 million. Mr. Cobb further testified that Goss lowered its prices to win the NSL contract. Mr. Cobb testified at trial that the NSL sale represented a "loss position of about five million dollars." Mr. Cobb also testified that "if we had not been dealing with dumped prices from the Japanese we should have ... made a three million dollar profit."

The jury was also presented with evidence that TKS's written pricing was not an accurate representation of the prices that TKS offered. An internal TKS facsimile states that "we feel that Mr. Newhouse will feel that $9.4 million plus installation will be too high a price and may reluctantly get proposals from Goss and KBA for 2—4/4 Towers. If so, we are in danger of losing order." (PX 9). Mr. Strong then suggests that TKS "provide a written proposal showing conversion parts of $1.0 million more ... and *verbally* tell customer that if dumping problem was not involved, our 2—4/4 Tower price would be $8,431,481." (*Id.*). The court thus concludes that the jury's award relating to the NSL sale was not against the weight of the evidence. Consequently, the court denies TKS's motion for a new trial on the grounds that the jury's verdict regarding the NSL sale was unsupported by the evidence adduced at trial.

### b. Whether the jury instructions properly apprised the jury of the issues and the applicable law

TKS contends a new trial is warranted because the court erred in instructing the jury. Specifically, TKS argues that: (1)

Instruction No. 21 regarding product comparability was a misstatement of the law; (2) the court erroneously declined to adopt TKS's Proposed Jury Instruction No. 40B(2); (3) Instruction No. 22 defines "intent of injuring" in a manner inconsistent with the 1916 Act; and (4) Instruction No. 26 was improperly given because Goss did not carry its burden of proof.

### i. Product comparability

TKS argues it is entitled to a new trial because the court erred by giving Instruction No. 21. In this instruction, the court instructed the jury as follows:

> ... the technological differences between products should be compared in terms of customer use and preference and marketability. Products do not need to be identical to be comparable. To be comparable, products must be more than functional equivalents or in the same generic category. The comparison also must take into account the technological significance of any difference between the products and the differences in production costs caused by such differences. That products sold in Japan may have technical components that make them work in Japan while products sold in the United States have technical components that make them work in the United States does not make the products noncomparable.

Final Jury Instruction 21.

■ TKS objected to Instruction No. 21 at trial. TKS's argument was, and remains, that the jury should consider whether an importer could purchase large newspaper printing presses designed for use by Japanese newspapers and find a ready commercial market for their sale to publishers in the United States. In other words, TKS maintains that the 1916 Act requires that products be "commercially interchangeable." This court has already determined that when comparing techno-

logical differences between Japanese and U.S. presses, the products need not be identical but need only be comparable in terms of customer use and preference and marketability. *See* November 25, 2003 Order Supplementing November 13, 2003 Ruling on Motions for Summary Judgment at 16–17. As this court explained, Congress intended for the 1916 Act to be antitrust in nature. *Id.* at 16. Consequently, the 1916 Act allows for some physical differences between products sold in the United States and those sold in the home market. *Id.* at 17. TKS has not shown any reason for the court to depart from its earlier ruling. The court therefore finds that Instruction No. 21 accurately states the law. Accordingly, TKS's motion for a new trial based upon Instruction No. 21 is denied.

### ii. Price comparison

■ The next error that TKS alleges in its motion for a new trial is that the court erred by declining to adopt TKS's Proposed Jury Instruction No. 40B(2). TKS's proposed jury instruction would have instructed the jury on the prices to be compared for the United States and foreign presses. TKS contends the United States prices to be compared should be either the wholesale prices TKS charged in Japan or the prices TKS charged Japanese customers who purchased presses in wholesale quantities. This court has previously rejected TKS's position. In its November 25, 2003 Order Supplementing November 13, 2003 Ruling on Motions for Summary Judgment, this court held that it "is clear from the statutory text that Congress did not intend the terms 'actual market value' and 'wholesale price' to have the same meaning." *Id.* at 22. TKS has not shown any reason for the court to depart from its earlier ruling. The court thus holds that the court correctly refused TKS's Proposed Jury Instruction No. 40B(2). Con-

sequently, the court denies TKS's motion for a new trial based on the court's refusal to adopt TKS's Proposed Jury Instruction No. 40B(2).

### iii. Definition of "intent"

 TKS also argues that it is entitled to a new trial because the court erred by giving Instruction No. 22, defining "intent" under the 1916 Act. Instruction No. 22 defined "intent" as follows:

Intent is defined by the law as that purpose with which a person acts. The phrase "intent of injuring" does not mean an evil desire or a motive of causing harm. To act with an "intent of injuring" means to act with an intent to cause pecuniary loss, rather than simply to win sales and earn profits for oneself. The phrase "intent of destroying" means to act with an intent to put a United States industry out of business.

Final Jury Instruction No. 22.

TKS objected to Instruction No. 22 at trial. TKS's argument against this jury instruction was, and remains, that "intent" under the 1916 Act means the actor's conscious objective to injure or destroy the large newspaper printing press industry in the United States. TKS contends the court should have instructed the jury that: (1) a foreign seller who is motivated by a desire to make a profit for itself does not have a specific intent to injure or destroy a United States industry, nor does a foreign seller's knowledge that its sales will capture business away from its United States competitors establish specific intent; and (2) a loss on a particular contract won by Goss does not suffice to establish that TKS had the intent to injure or destroy the industry, and that price reductions in competitive situations do not violate the law unless they are motivated by a specific intent to drive a competitor from the market.

This court has previously rejected TKS's argument twice. First, Judge Melloy, in denying TKS's motion to dismiss, held that the 1916 Act does not require that the alleged dumper act with predatory intent. *Goss Graphic Systems v. Man Roland Druckmaschinen Aktiengesellschaft,* 139 F.Supp.2d 1040, 1048 (N.D.Iowa 2001). This court again held that the 1916 Act is "clear on its face with respect to the issue of the intent required, [and] the Court declines to read into the statute the restrictive meaning of the word 'injure' urged by TKS." November 25, 2003 Order Supplementing November 13, 2003 Ruling on Motions for Summary Judgment at 26. TKS's arguments regarding Instruction No. 22 are a mere rehash of arguments previously made and rejected by the court. For the same reasons this court previously rejected TKS's arguments, this court rejects them again. The court thus holds that Instruction No. 22 correctly instructed the jury as to the definition of "intent." Accordingly, TKS's motion for new trial based upon Instruction No. 22 is denied.

### iv. Lost sales and price suppression damages

TKS argues that the court should grant a new trial because the court erred by giving Instruction No. 26. This instruction instructed the jury on lost profits from lost sales and lost profits from price suppression. The instruction at issue reads as follows:

If you find the plaintiff Goss is entitled to recover damages, you shall consider the following items:

1. The amount of the profits Goss lost as a result of the following lost sales:

 a. Dallas Morning News 1996

 b. Dow Jones 1999

2. The amount of profits Goss lost due to price suppression on each of the following sales:

 a. Tribune Review 1996

 b. Newark Star Ledger 1997

 c. Orlando Sentinel 1997

 d. Dow Jones 1998

3. The opportunity cost of capital relating to lost profits from lost sales.

4. The opportunity cost of capital relating to price suppression.

Goss's "lost profits" are those profits Goss would, with reasonable certainty, have enjoyed if it had made the sale in question instead of the defendants or if Goss had not been forced to suppress its prices for large newspaper printing press units in response to the defendants' low prices. In arriving at the amount of profits Goss has lost in this case, you are entitled to consider Goss's past earnings in its business, in particular, those past earnings resulting from sales of the nature of the sales in this case.

Goss's "opportunity cost of capital" is the amount of damages Goss, with reasonable certainty, suffered because Goss was not able to put to more profitable uses the profits it would have received on the lost contracts or if it had not been forced to suppress its prices.

The amount you assess for any item of damages must not exceed the amount caused by the defendants as proved by the evidence.

A party cannot recover duplicative damages. Do not allow amounts awarded under one item of damage to be included in any amount awarded under another item of damage.

The amounts, if any, you find for each of the above items will be used to answer the special verdicts.

In arriving at an item of damage, you cannot arrive at a figure by taking down the estimate of each juror as to an item of damage and agreeing in advance that the average of these estimates shall be your item of damage.

Final Instruction No. 26.

TKS argues that Goss failed to meet its burden of proof regarding injury in this case for each of the sales for which the jury awarded Goss damages. For the reasons stated herein, the court holds that the evidence introduced at trial established each item included in the jury's damages award. The court therefore denies TKS's motion for a new trial on the grounds that the court erred by giving Instruction No. 26.

### c. Whether the court committed legal errors

### i. Whether the court admitted improper evidence

 TKS seeks a new trial on the ground that Goss introduced certain evidence which TKS claims improperly influenced the jury. Specifically, TKS contends that by admitting evidence regarding TKS's and the DMN's negotiations over the 1996 two tower order, including the $2.2 million rebate, the court opened the door to a flood of unfairly prejudicial evidence. In response, Goss argues that the court did not err in admitting such evidence because it is relevant to TKS's intent.

Under Federal Rule of Evidence 402, "[e]vidence which is not relevant is not admissible." Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Even relevant evidence, however, may be properly excluded if "its probative value is substantially outweighed by the danger of un-

fair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

The court finds that evidence regarding TKS's secret rebate to the DMN was relevant and probative to TKS's intent to enter sales at a dumped price. Furthermore, TKS has failed to demonstrate sufficient prejudice to outweigh the probative value of the evidence. The court thus holds that the evidence's probative value was not substantially outweighed by unfair prejudice, nor did it confuse the jury. Therefore, admission of the evidence does not warrant a new trial.

### ii. Whether the court improperly excluded evidence

■ Finally, TKS argues that the court erred by excluding evidence regarding: (1) customer complaints and the reasons provided by the customers for refusing to deal with Goss or demanding lower prices for Goss equipment, other than evidence directly related to the six contracts for which damages were claimed; (2) Goss's reputation in the marketplace for failed installations and poor equipment quality; (3) Goss's public disputes with customers over failed installations; (4) Goss's low-ball pricing strategy; (5) widespread industry concerns about Goss's future after the sale of the company to Stonington; and (6) expert testimony by TKS expert Robert Stoner's concerning his objective economic analysis of TKS's intent for purposes of the 1916 Act. TKS contends such evidence was critical to its defense and the exclusion of such evidence unfairly prejudiced TKS's ability to defend against Goss's claims. Goss responds that: (1) the court did in fact allow evidence regarding customer complaints where there was some nexus between the complaints and the sales at issue; (2) with respect to customer complaints concerning

sales not at issue, the court properly ruled that such evidence was irrelevant; (3) the court specifically allowed TKS to question Goss's witnesses on the Stonington acquisition; and (4) Dr. Stoner was permitted to testify as to his objective economic analysis of TKS's intent.

The court has reviewed the record and concludes that it did not err by excluding evidence regarding customer complaints and the reasons provided by the customers for refusing to deal with Goss or demanding lower prices for Goss equipment, other than evidence directly related to the six contracts for which damages were claimed. Evidence that is not relevant is inadmissible under Federal Rule of Evidence 402. As the court ruled during trial, evidence with respect to customer complaints concerning sales not at issue in this case was irrelevant. TKS has not shown any reason for the court to depart from its earlier ruling. The court thus holds that the court correctly excluded evidence regarding customer complaints and the reasons provided by the customers for refusing to deal with Goss or demanding lower prices for Goss equipment, other than evidence directly related to the six contracts for which damages were claimed. The court therefore correctly excluded such evidence pursuant to Federal Rule of Evidence 402.

Finally, TKS contends the court improperly excluded expert testimony by TKS's expert witness Robert Stoner concerning his objective economic analysis of TKS's intent for purposes of the 1916 Act. TKS is mistaken about the court's ruling as to the testimony concerning intent from Dr. Stoner. During trial, the court ruled that Dr. Stoner could not provide a legal opinion concerning the definition of intent under the 1916 Act; however, the court did not bar Dr. Stoner from testifying as to his objective economic analysis of TKS's intent. The court therefore holds that the

court's ruling regarding Dr. Stoner's testimony does not warrant a new trial.

### B. Motion for Judgment as a Matter of Law

#### 1. Standard of Review

A motion for judgment as a matter of law may only be granted if there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. Fed.R.Civ.P. 50(a)(1). In reviewing a motion for judgment as a matter of law, the court must consider the evidence in the light most favorable to the plaintiff and give the plaintiff the benefit of all reasonable, favorable inferences. *Racicky v. Farmland Indus., Inc.*, 328 F.3d 389, 393 (8th Cir.2003). "[T]he court must assume as proven all facts that the non-moving party's evidence tended to show, give [it] the benefit of all reasonable inferences, and assume that all conflicts in the evidence were resolved in [its] favor." *Hathaway v. Runyon*, 132 F.3d 1214, 1220 (8th Cir.1997). The court "may not make credibility determinations or weigh the evidence" in considering a motion for judgment as a matter of law. *Garcia v. City of Trenton*, 348 F.3d 726, 727 (8th Cir.2003) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). To the extent defendants raise a question about the sufficiency of the evidence to support the factual basis for the verdict, defendants must satisfy a high standard:

Judgment as a matter of law is proper "[o]nly when there is a complete absence of probative facts to support the conclusion reached" so that no reasonable juror could have found for the nonmoving party.

*Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 615 (8th Cir.2000) (quoting *Hathaway*, 132 F.3d at 1220). "This high standard protects the role and province of the jury to determine which inferences shall

be drawn from the evidence presented." *Garcia*, 348 F.3d at 727.

#### 2. Analysis

In support of its motion for judgment as a matter of law, TKS argues that this case should not have been submitted to the jury because Goss failed to meet its burden of proof with regard to each element of its claim and because the jury's finding of injury with respect to the three sales has no evidentiary basis.

##### a. Whether Goss met its burden of proof with regard to each element of its claim

The elements of Goss's dumping claim are:

First, that the defendant under consideration commonly and systematically imported or sold, or caused to be imported or sold, newspaper press printing units within the United States at a price substantially less than the actual market value or wholesale price, at the time of exportation to the United States, of comparable printing units in Japan.

Second, that such acts were done with the intent of injuring or destroying an industry in the United States.

Third, that Goss was injured in its business or property by reason of the defendant's conduct.

Final Jury Instruction No. 18. TKS disputes the sufficiency of the evidence on all of these elements.

##### i. Evidence that TKS commonly and systematically sold newspaper press printing units within the United States at prices substantially below the prices of comparable printing units in Japan

TKS challenges the sufficiency of the evidence on element one of Goss's dumping claim. TKS argues that there

was insufficient evidence that TKS's bids to the OS and the NSL were substantially below the actual market value or wholesale price TKS charged Japanese customers for comparable printing units. The court finds that sufficient evidence was presented from which a reasonable jury could have concluded that TKS commonly and systematically sold LNPPs in the United States at prices substantially below the prices of comparable printing units in Japan. Goss's expert, Mr. Sims, examined all of TKS's sales in the United States from 1992 through 2000 and determined that each of those sales was dumped. Mr. Sims testified that every one of these sales were at "price[s] that were substantially below the market value or price in Japan for the same product." Mr. Sims' comparison of the prices TKS charged in the United States and in Japan showed that every sale of a large newspaper printing unit that TKS made in the United States was made at a price $277,302 to $28,785,576 below the price TKS charged for comparable printing unit sales in Japan. (PX 21.1). The jury also heard testimony from Roland Palmatier, Goss's press engineering expert, that the printing units that Mr. Sims compared in his dumping analysis were "directly comparable in terms of technology, construction, basic design and value." The court thus holds that Goss offered sufficient evidence to establish the first element of its dumping claim.

### ii. Evidence that TKS intended to injure or destroy an industry in the United States

As to the second of the challenged elements, whether TKS intended to injure or destroy an industry in the United States, TKS argues that Goss failed to introduce evidence sufficient to establish that the prices offered to the OS and the NSL were set with the specific intent of injuring or destroying Goss. The court's review of the record leads it to conclude that Goss established an evidentiary basis for element two of its claim. The jury heard evidence at trial regarding: (1) TKS's aggressive and unprofitable competitive strategy against Goss; (2) TKS's celebration of Goss's weakening financial position; and (3) TKS's cover-up schemes designed to conceal its dumping.

The jury was presented with evidence that TKS believed itself to be in a war of survival with Goss, which it intended to win at any cost, even to the extent of taking sales from Goss on which TKS would lose money. For example, upon learning of a discount Goss was offering a customer, TKS's director and head of overseas sales, Tadashi Morimoto, sent a facsimile to TKS (USA) stating:

> If Goss wants to sling mud at TKS in such dirty strategy to destroy TKS, I believe TKS must do something like an eye for an eye, a tooth for a tooth. Look here, Goss, TKS will show them a thing or two—three—four in Japan, Asia, U.S.A. & in any other territory until TKS wins completely this survival game.

(PX 24). This same "survival" strategy is evident from a memo from Mr. Morimoto and another TKS executive, Takehiro Fukuyama, to TKS (USA) President Jim Norris. In discussing the Chicago South Town Economist, they requested that, "as you did it with Spokane, please do your best to get this order by all means." (PX 29). Moreover, Goss introduced evidence at trial that each of TKS's sales during this period was made at a loss.

The jury also heard evidence at trial that TKS's officers and directors monitored Goss's financial position and congratulated their employees on news that Goss was laying off workers, closing its Iowa manufacturing plant, and in financial distress. For example, on June 24, 1996, Mr.

Morimoto sent a facsimile to TKS (USA) employee Jesse Strong, stating that TKS was "very pleased" with information Mr. Strong sent to Japan indicating that: (1) Goss was closing its Cedar Rapids plant for 2–4 weeks because of a lack of orders; (2) Goss was closing down and laying off employees in its control department; and (3) Goss's employees were likely to go on strike because of a lack of a pay raise for two years. (PX 126, 159). In a September 7, 1996 facsimile, Mr. Morimoto not only congratulated Mr. Strong, but also lauded TKS competitor Man Roland for "fighting bravely," and said that he was "very happy" to see Mr. Strong's report that Goss was "in a vulnerable position at present— having no U.S. backlog in a factory ... [and] having to issue $300 [million] in bonds." (PX 161).

Finally, Goss showed TKS's intent by presenting evidence of TKS's schemes to hide the true amount of its dumped prices by recording different prices on paper than it was offering verbally and by destroying documents which referred to its true prices. For example, on the NSL sale, in an unnumbered facsimile, Mr. Strong and TKS (USA) National Sales Manager Michael Shafer suggest to TKS, Ltd., President Kohei Shiba and Mr. Fukuyama that TKS "provide a written proposal showing conversion parts price of $1.0 million more ... and *verbally* tell customer that if dumping problem was not involved, our 2—4/4 Tower price would be $8,431,481." (PX 9). The court therefore concludes that Goss introduced evidence at trial on which a reasonable jury could base its finding that TKS dumped its printing units in the United States with an intent to injure or destroy Goss.

### iii. Evidence that TKS injured Goss

TKS contends there was insufficient evidence that TKS's conduct injured Goss. As to this third element, TKS specifically argues that Goss introduced no evidence that it was injured by TKS's bids to the OS and the NSL. TKS submits that the jury's finding of injury to Goss in connection with the OS and the NSL sales was based on speculation. TKS also contends that Goss's injury relating to the DMN sale was not caused by TKS's conduct, but rather by the DMN's decision not to invite Goss to submit a bid.

The jury heard evidence from which it could reasonably conclude that TKS's dumping from 1992 to 2000 injured Goss both by depriving Goss of sales that it would have made absent TKS's dumped pricing and by suppressing prices in the market so that Goss lost profits on sales it won. At trial, the jury heard evidence that Goss lost sales and revenue because of TKS's dumping. Former Corporate Controller and current Goss contractor David Rodemeyer testified that Goss's "profits went down dramatically [during] the 1991 to 1994 or 1995 timeframe" as a result of TKS's dumping. Goss's profits declined from $51 million in 1991 to $84,000 in 1993, to a loss of $197,000 in 1994.

For each sale TKS won during this period, its non-dumped price was greater than Goss's bid prices for those sales (PX 680B). Goss introduced expert testimony that, based on these significant price discrepancies, Goss would have won each of the sales at issue if TKS had offered its non-dumped prices. Goss also introduced evidence that TKS was fearful of losing these sales if it offered higher, non-dumped prices. Goss further introduced evidence that it lost $40,576,838 in profits on the sales that TKS made by offering dumped prices. (PX 716).

Goss also introduced evidence from which the jury could reasonably conclude that TKS's dumping caused price erosion in the market, generally lowering prices and causing Goss to lose millions more on sales Goss made. (PX 739). Goss intro-

duced evidence that it was forced to lower its prices to compete with TKS and lost profits as a result. Goss's expert Mr. Sims examined the sales in which Goss and TKS were the final head-to-head competitors. Although Goss won each of these sales, Mr. Sims found that Goss lost profits on the sales due to price suppression from TKS's dumped pricing. Goss also presented evidence that it lost $20,912,121 in profits due to price suppression on the sales it won at lower prices due to price competition from TKS (PX 739). The court therefore holds that Goss introduced evidence sufficient for the jury to conclude that Goss was injured by TKS's conduct.

### b. *Whether the evidence supports the jury's finding of injury*

TKS contends it is entitled to judgment as a matter of law on the ground that the jury's finding of injury with respect to the three sales at issue (the DMN in 1996, the OS in 1997, and the NSL in 1997) has no evidentiary basis. The court has already addressed TKS's argument in the context of TKS's other post-trial motion. As the court explained, *infra*, the jury's damages award with respect to the three sales at issue was fully supported by the evidence presented at trial. For the same reasons the court denied TKS's motion for a new trial on the basis that the jury's verdict was unsupported by the evidence, the court also denies TKS's motion for judgment as a matter of law.

### III. CONCLUSION

In light of the foregoing, IT IS ORDERED that:

1. Defendants Tokyo Kikai Seisakusho, Ltd.'s, and TKS (U.S.A.), Inc.'s Motion for a New Trial (docket no. 417) is DENIED; and

2. Defendants Tokyo Kikai Seisakusho, Ltd.'s, and TKS (U.S.A.), Inc.'s Motion

for Judgment as a Matter of Law (docket no. 418) is DENIED.

**IT IS SO ORDERED.**